Tai Kwan CURETON, Leatrice Shaw, Andrea Gardner, and Alexander Wesby, Individually and on Behalf of all Others Similarly Situated, Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.

No. CIV. A. 97–131.

United States District Court, E.D. Pennsylvania.

March 8, 1999.

Order Modifying Opinion March 16, 1999.

Elizabeth R. Leong, Stradley, Ronon, Stevens & Young, Andre L. Dennis, Stradley, Ronon, Stevens & Young, LLP, Danielle Banks, Stradley, Ronon, Stevens & Young, LLP, Philadelphia, PA, Adele Kimmel, Trial Lawyers for Public Justice, Washington, DC, J. Richard Cohen, Southern Poverty Law Center, David Schoen, Montgomery, AL, for Tai Kwan Cureton, Leatrice Shaw, Andrea Gardner, Alexander Wesby, each individually and on behalf of all others similarly situated, Plaintiffs.

David P. Bruton, Michael W. Mc Tigue, Jr., Drinker, Biddle & Reath, Philadelphia, PA, for National Collegiate Athletic Association, Defendants.

## *OPINION*

BUCKWALTER, District Judge.

The primary question presented by the parties' cross-motions for summary judgment is whether Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d *et seq.*, and certain implementing regulations promulgated thereunder, prohibit colleges and universities, through the auspices of the National Collegiate Athletic Association ("NCAA"), from requiring students to achieve a minimum score on either of two standardized tests as a condition of eligibility to participate in intercollegiate athletics and/or receive athletically related financial aid during their freshman year.

For the reasons discussed below, the Court holds, as a matter of law, that the NCAA is subject to suit under Title VI, and that the NCAA's initial eligibility rule has an unjustified disparate impact against African–Americans. Accordingly, Plaintiffs' motion is GRANTED and Defendant's motion is DENIED.

## I. BACKGROUND

This is a putative class action lawsuit brought by four African–American student-athletes (Tai Kwan Cureton, Leatrice Shaw, Andrea Gardner, and Alexander Wesby), alleging that they were unlawfully denied educational opportunities as freshmen through the operation of initial eligibility rules by the NCAA. Specifically, they claim that these rules ("Proposition 16") utilize a minimum test score requirement that has an unjustified disparate impact on African–American student-athletes.

All four named plaintiffs failed to achieve initial eligibility under these rules because they did not meet the minimum standardized test cutoff score and consequently, were denied the opportunity to compete in intercollegiate athletics during their freshman year at Division I schools,

denied admission to Division I schools, denied athletic scholarships by Division I schools (or provided with less athletically related financial aid), and/or denied recruiting opportunities by Division I schools (or provided with fewer recruiting opportunities).

Apart from requesting class certification, Plaintiffs pray for the entry of a declaratory judgment of Title VI liability; a preliminary and permanent injunction enjoining the NCAA from continued operation of Proposition 16; a notification to Division I schools that student-athletes who satisfy the minimum GPA/core course requirement of Proposition 16 are immediately eligible to participate in freshman year athletics; and the provision of a fourth year of eligibility under the NCAA rules for those student-athletes who have lost a year of freshman eligibility at Division I schools due to the minimum test score requirement of Proposition 16.

On October 8, 1997, this Court held that, while a private right of action exists under Title VI and its implementing regulations, Plaintiffs must still establish: (1) that the NCAA receives federal financial assistance, and (2) that the NCAA's minimum test score requirement in Proposition 16 violates Title VI because the requirement has an unjustifiable disparate impact on African–American student-athletes. *See Cureton v. NCAA*, Civ. A. No. 97–131, 1997 WL 634376, at \*2 (E.D.Pa. Oct. 8, 1997). Approximately one year later to the day, the Court received the first of the parties' voluminous submissions in their cross-motions for summary judgment. It would be difficult to summarize the enormous amount of factual information presented in the record, particularly since much of it is in the form of charts, tables, and graphs. However, some background on the NCAA and Proposition 16 is necessary for an understanding of this Court's opinion.[1]

---

1. The ensuing background information was culled primarily from the following sources:

Marshall Aff. ¶¶ 2–3 (Exhibit 1 to Docket No. 4); NCAA Division I Academics/Eligibili-

The NCAA is a voluntary, unincorporated association of approximately 1,200 members, consisting of colleges and universities, conferences and associations, and other educational institutions. Its active members are four-year colleges and universities located throughout the United States. The active members are divided, for purposes of bylaw legislation and competition in intercollegiate championship events, into Division I, II, and III, with further classification of Division I members into Division I–A Football and Division I–AA Football. The only funds received by the NCAA from its members are in the form of annual dues determined by the members. The record, however, is not clear as to whether the NCAA directly receives federal financial assistance.

While some bylaws of the NCAA are applicable to all divisions, each division may, and has, adopted bylaws applicable only to that division. This lawsuit deals with the promulgation of a bylaw affecting initial eligibility only in Division I. Prior to 1971, freshmen were not eligible to participate in varsity athletics. Various eligibility rules affecting freshman participation in athletics were put into effect thereafter. During the early 1980s, public attention focused on the perceived lack of adequate academic preparation and success of student-athletes. Evidence existed that student-athletes were being exploited for their athletics talents and were exhausting their athletics eligibility without any realistic hope of obtaining an undergraduate degree. However, at the same time, student-athletes were graduating at rates comparable to non-athletes, and African–American student-athletes were graduating at rates higher than African–American students in general.

After debating the issue for several years, the Division I membership implemented Proposition 48 during the 1986–1987 academic year, requiring high school graduates to present a 2.000 GPA in 11 academic core courses and a minimum score of 700 on the SAT (or a composite score of 15 on the ACT) before being allowed to participate in freshman athletics. If the criteria in this "double-cut" or "conjunctive" rule were met, student-athletes were declared "eligible" for competition, practice, and athletically related financial aid immediately upon enrollment. Otherwise, they were barred from such opportunities during their first year. The standards, however, neither addressed a student-athlete's admission to a particular institution, nor precluded a student-athlete from receiving institutional financial aid generally available to all students. The Proposition 48 requirements were phased in by the 1988–1989 academic year and, over time, student-athletes have improved their academic performance—particularly African–American student-athletes—as measured by an increase in their graduation rates.

The initial eligibility rules were modified in 1992 (fully implemented in the 1996–1997 academic year) with the adoption of Proposition 16 (ultimately codified at NCAA Bylaw 14.3), which increased the number of required core courses to 13 and introduced an initial eligibility index or "sliding scale." Using the index, the student-athlete could establish eligibility with a GPA as low as 2.000, provided the student also presented an SAT score of 1010[2]

ty/Compliance Cabinet Subcommittee on Initial–Eligibility Issues Mem., July 27, 1998, at 7 (Exhibit C to Docket No. 41); NCAA Membership Services Initial Eligibility Satellite Video Conference, Aug. 19, 1998, Tr. at 6–7 (statement of Todd A. Petr) (as amended) (Exhibit 7 to Docket No. 54); *Athletics and Academics in the Freshman Year: A Study of the Academic Effects of Freshman Participation in Varsity Athletics*, Dec. 1984, at 1–3 to 1–6, NCAA 12815–12818 (Exhibit 25 to Docket No. 54).

**2.** "In April 1995, the College Board recentered the score scales for all tests in the SAT Program to reflect the contemporary test-taking population. Recentering reestablished the average score for a study group of 1990 seniors at about 500—the midpoint of the 200–to–800 scale—allowing students, schools, and colleges to more easily interpret their scores in relation to those of a similar group of college-bound seniors." *Recentered Scale*

or an ACT sum (as opposed to composite) score of 86. At the other end of the index, a minimum 820 SAT or 68 ACT sum score establishes the floor for students with GPAs of 2.500 or higher. Statistically speaking, the resultant effect of Proposition 16 was to modify Proposition 48 by increasing the weight assigned to GPAs relative to test scores: while the core GPA cutoff score of 2.000 is set at two standard deviations below the national mean, the SAT/ACT test cutoff scores are set at only one standard deviation below the national mean, resulting in a heavier weighting of the standardized test. A student-athlete not qualifying under Proposition 16 may become a partial qualifier by presenting an SAT score between 720 and 810 (ACT score between 59 and 67) and a core GPA that produces a GPA-test combination score comparable to that required of qualifiers. Partial qualifiers may not compete in intercollegiate athletics, but may be eligible for athletically related financial aid.

## II. DISCUSSION

### A.

### STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is "material" if it might affect the outcome of the case under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,

106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Additionally, an issue is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative; rather, the court must consider the evidence of the non-moving party as true, drawing all justifiable inferences arising from the evidence in favor of the non-moving party. *See id.* at 255, 106 S.Ct. 2505. If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party. *See id.* "This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir.1987). When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). In doing so, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the evidence of the non-moving party is "merely colorable," or is "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

(visited Feb. 22, 1999) <http://www.collegeboard.org/ sat/ html/ admissions/ cbs/ cbsrec97.html>. Accordingly, a test score of 700 on the old scale is approximately equivalent to a 830 on the recentered scale, and a score of 900 on the old scale is approximately equivalent to a 1010 on the recentered scale. *See SAT V + M Composites: Original to Recentered Scale* (visited Feb. 22, 1999) <http:// www.collegeboard.org/sat/html/admissions/equiv/rt027027.html>.

Counsel have made a myriad of arguments, and an attempt has been made to address most of them. By not commenting on any particular argument, or omitting a citation to a document in the record, the Court is not implying that it has either rejected or adopted the argument, or failed to review the record in its entirety.

## B.

### *IS THE NCAA SUBJECT TO TITLE VI?*

■ Having previously determined that the NCAA is a program or activity covered by Title VI, *see Cureton v. NCAA,* Civ. A. No. 97–131, 1997 WL 634376, at *2 (E.D.Pa. Oct.8, 1997), the Court must also decide, as a preliminary matter, whether the NCAA receives federal financial assistance before subjecting the NCAA to the strictures of Title VI and its implementing regulations, *see* 42 U.S.C. § 2000d (prohibiting discrimination "on the ground of race . . . under any program or activity receiving Federal financial assistance").

Plaintiffs attest that in response to a Request for Admissions they propounded, the NCAA admitted that it receives dues from member schools who are recipients of federal funds. Accordingly, Plaintiffs conclude that the NCAA indirectly receives federal financial assistance because the NCAA acts as the member institutions' agent with respect to the governance of intercollegiate athletics. Plaintiffs also contend that, under *Smith v. NCAA,* 139 F.3d 180 (3d Cir.), *cert. granted,* —— U.S. ——, 119 S.Ct. 31, 141 L.Ed.2d 791 (1998) (argued Jan. 20, 1999), the NCAA would be subject to Title VI as an indirect recipient of federal funds by virtue of its relationship to its member colleges and universities. Finally, Plaintiffs maintain that the NCAA is a recipient of federal funds

through its alter ego, the National Youth Sports Program Fund ("Fund").[3]

In response, the NCAA contends that Plaintiffs' continued reliance on *Smith* is increasingly dubious in light of the arguments made in the Supreme Court by the Solicitor General of the United States and Smith's counsel, each of whom cast some doubt on the Third Circuit's analysis. The NCAA also asserts that, in the October 8th order, this Court rejected the argument that the mere receipt of dues from its membership may subject the NCAA to the provisions of Title VI, although the Third Circuit in *Smith* had ruled in favor of this argument in the context of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

To be clear, in the October 8, 1997 order, this Court specifically left it to Plaintiffs to establish at trial that the NCAA is subject to suit under Title VI. *See Cureton,* 1997 WL 634376, at *2 ("at the trial on the merits of this case, plaintiff will have to prove: (1) that the NCAA receives federal financial assistance"). Specifically, the Court first ruled that, under the definition found in 42 U.S.C. § 2000d–4a, "the NCAA appears to be a program or activity covered by Title VI." *Id.* Then, contrary to the NCAA's assertion that the Court rejected the argument that the mere receipt of dues from its membership may subject the NCAA to the provisions of Title VI, the Court only refrained from determining whether "the National Youth Sports Program Fund is nothing more than a sham to disguise the NCAA's use of federal funds for its own benefit" on the basis of the record then before it. *Id.* Nothing in the Court's order precluded Plaintiffs from proceeding on the theory that the Fund is the alter ego of the NCAA at a trial on the merits. Significantly, the Court also took under advisement the other theories advanced by Plaintiffs for finding the NCAA

**3.** The Fund is an enrichment program for economically disadvantaged youths that provides summer education and sports instruction on the campuses of NCAA member and non-member institutions of higher education.

*See* Thiebe Aff. ¶ 2 (Exhibit 2 to Docket No. 4); Guidelines for the 1993 National Youth Sports Program, at 1, NCAA 009886 (Exhibit I to Docket No. 11).

subject to suit under Title VI and thus, rendered no opinion on their viability.

In any event, it appears that the NCAA accurately predicted the Supreme Court's decision in *Smith*. In the midst of this Court's consideration of the issue, the Supreme Court vacated the judgment of the Third Circuit and remanded the case for further proceedings because the appellate court had "erroneously held that dues payments from recipients of federal funds suffice to subject the NCAA to suit under Title IX." *NCAA v. Smith*, 119 S.Ct. 924, 930 (1999).

*Smith* is applicable to this case because "Title IX was patterned after Title VI of the Civil Rights Act of 1964. Except for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to describe the benefited class.... The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years." *Cannon v. University of Chicago*, 441 U.S. 677, 694–96, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (footnotes omitted). *See also Smith*, 119 S.Ct. at 928 n. 3 (stating that "[t]he scope of several other federal antidiscrimination measures is defined in nearly identical terms" and citing Title VI).

Thus, under the rationale of *Smith*, Plaintiffs may no longer rely solely on this theory to establish that the NCAA receives federal funds sufficient to subject the NCAA to suit under Title VI because "[a]t most, the Association's receipt of dues demonstrates it indirectly benefits from the federal assistance afforded its members. This showing, without more, is insufficient to trigger Title [VI] coverage." *Id.*, 119 S.Ct. at 929. Indeed, the regulations implementing Title VI are even more explicit than the Title IX regulations at issue in *Smith* in excluding "any ultimate beneficiary" as a "recipient" for Title VI purposes. 45 C.F.R. § 80.13(I) (1999); *accord* 34 C.F.R. § 100.13(I) (1999); *see also*

*Smith*, 119 S.Ct. at 929 (holding that "entities that only benefit economically from federal assistance are not" recipients).

However, as the above-quoted language suggests, Plaintiffs are not precluded from using this theory in combination with other facts to establish that the NCAA receives federal funds sufficient to trigger Title VI coverage. *See Smith*, 119 S.Ct. at 929 (offering "earmarked" federal funds as one example of such a fact). Nor are Plaintiffs precluded from advancing alternative theories for bringing the NCAA within the purview of Title VI. *See id.*, 119 S.Ct. at 930 nn. 6–7. While the law of the case doctrine properly constrains the scope of this Court's reconsideration of a prior order, in light of the Supreme Court's intervening decision on this issue and the lack of any prejudice to the parties, the Court undertook a thorough review of the record and the numerous briefs previously submitted for this Court's consideration. *See Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir.1997) (identifying prudential considerations limiting a trial court's reconsideration of a prior decision); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 245, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (reiterating the principle that "a court should apply the law in effect at the time of decision"). Consequently, the Court is now prepared to make definitive rulings on the alternative theories advanced by Plaintiffs.

Initially, the Court notes that this case is in a much different, more developed procedural posture than *Smith*. *Smith* involved a district court's denial of leave to amend a complaint. Here, the parties have engaged in extensive discovery, resulting in a substantial factual development of the record and the present cross-motions for summary judgment. Moreover, the parties have collectively submitted five post-*Smith* letter briefs that include, *inter alia*, additional arguments, evidentiary materials, and copies of briefs filed with the Supreme Court in *Smith*. Thus, the Court concludes that the parties

have thoroughly briefed this issue and definitive rulings are possible.

Plaintiffs appear to be advancing four additional theories to support a conclusion that the NCAA is subject to the reach of Title VI: (1) that the NCAA *directly* receives federal financial assistance through the Fund (which indisputably is a recipient of federal funds) because the Fund is nothing more than the NCAA's alter ego; (2) that the NCAA *indirectly* receives federal financial assistance through the Fund due to the NCAA's complete control over the Fund; (3) that members schools who receive federal funds have created and comprise the NCAA *and* that the NCAA governs its members with respect to athletics rules; and (4) that recipients of federal financial assistance have ceded controlling authority over a federally funded program to the NCAA, who then becomes subject to Title VI regardless of whether it is itself a recipient.

As for the first theory, this Court held on October 8, 1997 that a ruling on whether the NCAA directly receives federal financial assistance through its alter ego, the Fund, "can neither be made nor refuted based upon the present record before the court." *Cureton,* 1997 WL 634376, at *2. Upon reconsideration, the Court essentially adheres to that earlier decision as the present record provides no basis to disturb it and thus, concludes that Plaintiffs have failed to sustain their heavy burden of "piercing the corporate veil" sufficient to have the Fund construed as the NCAA's alter ego.

■ However, as for the second theory, the Court determines that Plaintiffs have sustained their burden of proving that the NCAA exercises effective control and operation of the Community Services Block Grant given by the United States Department of Health and Human Services to be construed as an indirect recipient of federal financial assistance. While, on this record, there was nothing improper in establishing a separate corporation to manage the National Youth Sports Program and for the corporation to be the designated recipient of the block grant, overwhelming evidence in the record supports the fact that the Fund is ultimately being controlled by the NCAA.[4] That is, although the Fund is the named recipient of the block grant, it is merely a conduit through which the NCAA makes all of the decisions about the Fund and the use of the federal funds.

The NCAA maintains that there is only an administrative services contract between itself and the Fund. However, the Court was not presented with a copy of that contract and, even if the contract were presented, the true nature of the relationship and operations between the two entities has been firmly revealed by the record. Consequently, as the NCAA is deemed a recipient of federal funds under this theory, all of its operations, including its promulgation of initial eligibility rules, are covered by Title VI. *See* 42 U.S.C. § 2000d–4a (4) (establishing entity-wide coverage).

■ Finally, the Court considered the third and fourth theories together because, as the Court understands them, they are simply variants of one another, differing only in degree. The Court determines that Plaintiffs have also sustained their burden of proving that the NCAA is subject to suit under Title VI irrespective of whether it receives federal funds, directly or indirectly, because member schools (who themselves indisputably receive federal funds) have ceded controlling authority over federally funded programs to the NCAA.

---

4. *See, e.g.,* Marshall Dep. at 82–86 (Exhibit D to Docket No. 11); Thiebe Dep. at 14–17; 21–23; 25–29; 57–61, 78–79, 92–95 (Exhibit E to Docket No. 11); *id.* at 96–97 (stipulation by NCAA's counsel that a committee of the NCAA renders final determinations with respect to the program, requiring no further action or authorization by the Fund); *see also* Br. of *Amici Curiae* Trial Lawyers for Public Justice, P.C. and Southern Poverty Law Center in Support of Respondent in *NCAA v. Smith,* No. 98–84, at 9–15, 1998 WL 784591.

The NCAA plays a pivotal role in "maintain[ing] intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body." *NCAA v. Tarkanian*, 488 U.S. 179, 183, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988).[5] Because of the unique nature of intercollegiate athletics and the various industries that have grown around it, it is one of the few educational programs of a college or university that cannot be conducted without the creation of a separate entity to provide governance and administration. In this vein, the NCAA has adopted "legislation," like Proposition 16, "governing the conduct of the intercollegiate athletic programs of its members.... By joining the NCAA, each member agrees to abide by and to enforce such rules." *Tarkanian*, 488 U.S. at 183, 109 S.Ct. 454.[6] Specifically, in the case of eligibility requirements, those rules are "designed to assure proper emphasis on educational objectives, to promote competitive equity among institutions and to prevent exploitation of student athletes." NCAA Const., art. 2, rule 2.12 (Exhibit A to Docket No. 11). Thus, the creation of this supervising association is not only nec-

essary for the promotion of intercollegiate athletics, but the existence of that entity is merely a consequence of the inherent nature of the member institution's intercollegiate athletics programs.[7]

The NCAA places much stock in Article 2, rule 2.1.1 of its constitution, which states that "[i]t is the responsibility of each member institution to control its intercollegiate athletics program in compliance with the rules and regulations of the Association." Moreover, Article 6, rule 6.01.1 states that "[t]he control and responsibility for the conduct of intercollegiate athletics shall be exercised by the institution itself."[8] However, these rules merely reinforce the Court's understanding that the NCAA and its members have agreed that the schools exercise control over their intercollegiate athletics programs to the extent permitted by the constitution and bylaws of the NCAA. Once legislation affecting the membership nationwide (or a subset of the institutions like in the case of Proposition 16) is adopted by the NCAA, it becomes enforceable and binding on the member schools. As in any relationship in which authority is transferred, a school is always free to choose not to abide by the legislation, but it will then either suffer sanctions

---

5. *Accord* 1995–1996 NCAA Annual Reports, at 46 (Exhibit H to Docket No. 15).

6. *Accord* NCAA Const., art. 1, rule 1.3.2 ("Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation.") (Exhibit A to Docket No. 11); *id.*, rule 2.01 ("legislation enacted by the Association governing the conduct of intercollegiate athletics shall be designed to advance one or more basic principles ... to which the members are committed."); Br. of Petitioner NCAA in *NCAA v. Smith*, No. 98–84, 1998 WL 784591, at *23 ("the NCAA often adopts rules that are opposed by individual institutions, and is required to take enforcement actions over the opposition of individual members, for the collective good"). *See also NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 101, 117, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (acknowledging that for intercollegiate athletics to exist, a "myriad of rules ... must be agreed upon" and that "a

certain degree of cooperation is necessary if the type of competition that [the NCAA] and its member institutions seek to market is to be preserved"); *Smith v. NCAA*, 139 F.3d 180, 183 (3d Cir.1998) ("The member institutions agree to abide by and enforce these rules."), *judgment vacated on other grounds*, —— U.S. ——, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999).

7. *See generally* Br. for the United States as *Amicus Curiae* in Support of Respondent in *NCAA v. Smith*, No. 98–84, at 24–33, 1998 WL 784591 (reflecting the collective views of the Solicitor General of the United States, United States Department of Education, United States Department of Health and Human Services, and the United States Department of Justice) (Exhibit 1 to Docket No. 54).

8. *See also* NCAA Const., art. 1, rule 1.2(b) (stating that a purpose of the NCAA is "[t]o uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this Association").

696

at the hands of the NCAA or be forced to renounce its membership in the association, a decision that would have grave consequences for its intercollegiate athletics program.

Whether characterized as a "delegation" or an "assignment" of "controlling authority," "regulation," or "supervision," Plaintiffs have established on this record that the member colleges and universities have granted to the NCAA the authority to promulgate rules affecting intercollegiate athletics that the members are obligated to abide by and enforce. Under these facts, the NCAA comes sufficiently within the scope of Title VI irrespective of its receipt of federal funds. While each of the member schools is also undeniably subject to Title VI for a challenge to Proposition 16, the NCAA, in light of the fact that it is the decisionmaking and enforcement entity behind legislation adopted by, and enforced against, its membership, is also subject to Title VI.

The import of such a determination is that the NCAA is subject to Title VI for claims relating to programs or activities to which those federal funds are directed. The statute proscribes discrimination "on the ground of race ... under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Thus, because there is a nexus between the NCAA's allegedly discriminatory conduct with regards to intercollegiate athletics and the sponsorship of such programs by federal fund recipients, the NCAA is subject to Title VI for a challenge to Proposition 16.

Accordingly, the Court holds that, under either the "indirect recipient" or "controlling authority" theories, the NCAA is subject to Title VI for a challenge to Proposition 16.

## C.

### DOES PROPOSITION 16 HAVE AN UNJUSTIFIED DISPARATE IMPACT?

In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971),

the Supreme Court introduced the theory of disparate impact discrimination by holding that a plaintiff need not necessarily prove intentional discrimination in order to establish that an employer has violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Since then, "facially neutral employment practices that have significant adverse effects on protected groups have been held to violate the Act without proof that the employer adopted those practices with a discriminatory intent." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 986–87, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (O'Connor, J., plurality opinion).

The disparate impact theory is premised upon the notion that "some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Id.* at 987, 108 S.Ct. 2777. That is, it does not purport to strive for equal results at the institution, but to ensure that individuals are not the victims of unintentional discrimination and thus, treated unequally. *See The Supreme Court 1988 Term Leading Cases, Title VII—Evidentiary Requirements in Disparate–Impact Cases,* 103 Harv. L.Rev. 350, 356–57 (1989) (arguing that the Supreme Court reshaped disparate impact law in accordance with a theory of "equal treatment," which "seeks to guarantee fair *process,*" rather than a "theory of equal achievement, which strives for fair *results*—racial parity after years of discrimination") (emphasis in original). Moreover, "[t]he evidence in these 'disparate impact' cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Watson,* 487 U.S. at 987, 108 S.Ct. 2777.

Although the disparate impact theory was originally developed in cases involving employment discrimination, courts have subsequently applied the theory to claims

brought pursuant to the regulations implementing Title VI. *See, e.g., NAACP v. Medical Ctr., Inc.,* 657 F.2d 1322, 1331 (3d Cir.1981); *New York Urban League, Inc. v. New York,* 71 F.3d 1031, 1036 (2d Cir. 1995); *Quarles v. Oxford Mun. Separate Sch. Dist.,* 868 F.2d 750, 754 n. 3 (5th Cir.1989); *Larry P. v. Riles,* 793 F.2d 969, 982 nn. 9–10 (9th Cir.1984); *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1407 & n. 14 (11th Cir.1993).

In order to establish a *prima facie* case of disparate impact discrimination, a plaintiff must initially demonstrate that the application of a specific facially neutral selection practice has caused an adverse disproportionate effect, to wit, excluding the plaintiff and similarly situated applicants from an educational opportunity. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656–57, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (superseded in part by statute). Where such a showing has been made, the burden of rebuttal shifts to the defendant, who must demonstrate that the selection ˙ practice causing the disproportionate effect is nonetheless justified by an "educational necessity," which is analogous to the "business necessity" justification applied under Title VI. *See Board of Educ. of the City Sch. Dist. of New York v. Harris,* 444 U.S. 130, 151, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979). The defendant bears only a burden of producing evidence to sustain its educational necessity. *See Wards Cove,* 490 U.S. at 659–60, 109 S.Ct. 2115. *But cf.* 42 U.S.C. §§ 2000e(m), 2000e–2k(1)(A) (requiring the defendant under Title VII to bear both a burden of production and persuasion on its business necessity justification).

Finally, even where a defendant meets that burden, a plaintiff may ultimately prevail by discrediting the asserted educational justification, or by proffering an equally effective alternative practice that results in less racial disproportionality while still serving the articulated educational necessity. *See Watson,* 487 U.S. at 998, 108 S.Ct.

2777. The ultimate burden of proving that the selection practice caused a discriminatory effect against a protected group always remains with the disparate-impact plaintiff. *See Wards Cove,* 490 U.S. at 659–60, 109 S.Ct. 2115.

1.

*Whether Proposition 16 Causes a Racially Disproportionate Effect*

■ In *Wards Cove,* the Supreme Court emphasized that a racially disproportionate effect is typically shown through the presentation of competent statistical evidence comparing the racial composition of candidates who are selected by the practice in question and the racial composition of the qualified candidate pool. *See* 490 U.S. at 650–55, 109 S.Ct. 2115. Without such carefully tailored statistical proof, there may be an insufficient basis to conclude that the causation requirement is satisfied. Plaintiffs have not presented their evidence of racially disproportionate effect in this fashion, and the NCAA has not drawn the Court's attention to this. Due to the interplay between enrollment and eligibility, the Court highly doubts that either party could have presented accurate statistics in this manner.

In any event, Plaintiffs are not limited to such a showing because "statistical proof can alone make out a prima facie case," *id.* at 650, 109 S.Ct. 2115, and there is no rigid mathematical threshold of disproportionality that must be met to demonstrate a sufficiently adverse impact on African–Americans in a disparate impact case, *see Watson,* 487 U.S. at 994–95, 108 S.Ct. 2777. Instead, the plaintiff may offer statistical evidence sufficient to show that the practice in question has caused the exclusion of candidates for a particular opportunity because of their membership in a protected group. *See id.* at 994, 108 S.Ct. 2777. The Supreme Court's "formulations" have only "stressed that statistical disparities must be sufficiently substantial

that they raise ... an inference of causation." *Id.* at 994–95, 108 S.Ct. 2777.[9]

Accordingly, Plaintiffs contend they have established their *prima facie* case by pointing to a July 27, 1998 NCAA memorandum to the Division I membership in which NCAA research data relating to Proposition 16 is summarized. In that memorandum, the NCAA makes the following observations about Proposition 16:

> African–American and low-income student-athletes have been **disproportionately impacted** by Proposition 16 standards. Of those African–American student-athletes appearing on a Division I Institution Request List submitted to the NCAA Initial Eligibility Clearinghouse, 26.6 percent did not meet Proposition 16 standards in 1996 and 21.4 percent did not qualify in 1997 (compared to 6.4 percent of white student-athletes in 1996 and 4.2 percent in 1997). This **disproportionate impact** also is seen (to a lesser degree) for other ethnic-minority groups.

> \* \* \* \* \* \*

> Preliminary enrollment data for 1994–1996 show a drop in the proportion of African–Americans among first-year scholarship athletes in Division I from 23.6 percent to 20.3 percent (accompanied by a 2.0 percent increase in white student-athletes and a 1.3 percent increase in student-athletes from all other ethnic groups combined).

> For both African–American and low-income student-athletes, the single largest reason for not meeting Proposition 16 standards was a failure to meet the minimum standardized test score.

> **The impact of the minimum standardized test score in Proposition 16 is partly a result of this standard being twice as stringent as the GPA minimum in terms of national norms.** Specifically, the cut score on the ACT/SAT (68/820) is set about one standard deviation below the national mean while the core GPA cut score (2.000) is set at two standard deviations below the mean. **Among a representative national population of students, it would be expected that more than 15 percent would be affected by the test minimum while less than three percent would be affected by the GPA minimum.** Differences in the Proposition 16 impact on minority groups and low-income student-athletes are in line with current group differences in national ACT/SAT score distributions.

NCAA Division I Academics/Eligibility/Compliance Cabinet Subcommittee on Initial–Eligibility Issues Mem., July 27, 1998, at 7 (Exhibit C to Pls.' Opening) (Plaintiffs' emphasis).[10] Moreover, the memorandum specifically states that "a disproportionate number of ethnic minorities are affected adversely by the imposition of these rules." *Id.* at 5.

Plaintiffs also point to a July 29, 1994 memorandum issued just prior to the adoption of Proposition 16, which states in the Executive Summary: "The Association's own research ... provides dramatic evidence of the **disparate impact** on both the current rules and those scheduled to go into effect in 1995 [Proposition 16] on minority student athletes." Report of the Special NCAA Comm. to Review Initial–Eligibility Standards Mem., July 29, 1994, at 2, NCAA 15639 (Exhibit A to Pls.'

**9.** *See, e.g., Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (analyzing employment standards that "select applicants for hire in a significantly discriminatory pattern"); *Washington v. Davis,* 426 U.S. 229, 246–47, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ("hiring and promotion practices disqualifying substantially disproportionate number of blacks"); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425,

95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (plaintiff required to show "that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants").

**10.** "Pls.' Opening" consists of a legal memorandum with exhibits A–D (Docket No. 41).

Opening) (Plaintiffs' emphasis). Finally, Plaintiffs look to a report prepared by the United States Department of Education, which cites that only 46.4% of the African–American college-bound high school seniors met Proposition 16's requirements, as compared to approximately 67% of white college-bound high school seniors. *See* Pls.' Ans. (Exhibit 3 thereto).[11] The report also indicates that the Proposition 16 cutoff score was the factor that caused the greatest degree of disparate impact because only 67.4% of African–American college-bound student-athletes cleared the test score hurdle, as compared to 91.1% of white college-bound student-athletes. *See id.* According to Plaintiffs, the essence of the disparate impact is that Proposition 16's cutoff score affects people of all races differently in that white student-athletes apply to Division I schools in greater numbers and are excluded less, while African–American student-athletes apply to Division I schools in smaller numbers and are excluded more.

Despite these and other similar admissions from its own documents, the NCAA suggests that the issue of disproportionate effect should be framed somewhat differently. The NCAA characterizes Plaintiffs as focusing on the alleged disparate impact of Proposition 16 on African–Americans because of the "well-known and continuing discrepancy" in the distribution of standardized test scores for black and white students. And yet, the NCAA notes that Plaintiffs are not alleging that either the SAT or the ACT is racially biased. While recognizing that this black-white gap in test scores necessarily means that a larger share of black students than white students who take the test will score below a given minimum, the NCAA instead posits that the educational opportunity at issue here is not the opportunity to participate in college athletics during the freshman year but rather, the opportunity to obtain a college degree.

The NCAA further argues that the ultimate goal of Proposition 16 is to raise the African–American student-athlete graduation rate. That is, the standards project that the black graduation rate will increase to 59.2%, which would be 94.8% of the projected white graduation rate of 62.5%. *See* Petr. Aff. ¶ 4 (Exhibit C to Def.'s Response).[12] The NCAA maintains that Plaintiffs have not disputed that African–Americans are graduating at higher rates; that the gap between African–Americans and white graduation rates has declined since the adoption of stricter initial eligibility rules; or that more African–American student-athletes are graduating since the adoption of the test score requirement.

The NCAA also contends that the increased number of African–Americans receiving athletic scholarships relative to their composition in the general student body is further proof of how college athletics has, in fact, benefited this group. According to the NCAA, although the initial eligibility rules have reduced the number of incoming African–American student-athletes, they have concomitantly resulted in creating more opportunities to graduate for those athletes that meet the eligibility standards. Thus, if graduation, and not freshman-year athletics, is the opportunity at stake here, the NCAA maintains that Plaintiffs have failed to demonstrate the requisite disproportionate effect.

Notwithstanding its attempt to reframe the lawsuit, the NCAA never disputes the veracity of the statements made in their own documents. These admissions and the bare statistics themselves plainly evince that African–Americans are being selected by Proposition 16 at a rate dispro-

---

11. "Pls.' Ans." consists of a legal memorandum (Docket No. 57), an appendix of 35 exhibits (Docket Nos. 54 and 56), and a second appendix of four additional documents (Docket No. 53).

12. "Def.'s Response" consists of a legal memorandum with exhibits A–D (Docket No. 48) and an appendix of 13 additional exhibits (Docket No. 47).

portionately lower than whites sufficient to infer causation.

The Court additionally notes that, in cases challenging selection practices that function as a pass/fail barrier (like the standardized test score cutoff of Proposition 16), a common basis for determining the statistical significance of the disparity is the Equal Employment Opportunity Commission's four-fifths (or 80%) rule. *See* 2 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law,* at 1729 (3d ed.1996). Under that rule, the EEOC generally presumes a selection rate which is less than four-fifths (or 80%) of the rate for the group with the highest rate as evidence of adverse impact. *See* 1978 Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4(D) (1999). Although this rule has been the subject of criticism because of its oversimplification, *see, e.g., Watson,* 487 U.S. at 995 n. 3, 108 S.Ct. 2777, the EEOC guidelines are "entitled to great deference," *Albemarle,* 422 U.S. at 431, 95 S.Ct. 2362 (quoting *Griggs,* 401 U.S. at 434, 91 S.Ct. 849). Neither party has drawn the Court's attention to the EEOC's rule, but applying it here shows that, in most instances, the selection rate of African–Americans is less than four-fifths that of the white selection rate.[13]

Because Proposition 16 relies, in part, on standardized test scores, it is undeniable that there will be some disparity between blacks and whites at some point in the eligibility determination. "The data suggest that *any* rule that is imposed will have a disproportionate effect on minority student-athletes (because of the difference in the distribution of minority [GPAs] and test scores) both in terms of false nega-

tives and overall number declared ineligible." NCAA Special Comm. to Review Initial Eligibility Standards Mem., May 29, 1994, at 1, NCAA 15916 (Exhibit 20 to Pls.' Ans.) (emphasis in original). It is precisely *this* educational opportunity that Plaintiffs are challenging, and not the opportunity to graduate.

Moreover, the Court finds unpersuasive the NCAA's argument that a selection practice having a disproportionate "beneficial" impact on the protected group can compensate for any disproportionate adverse impact on that same group. That singular fact misdirects the Court's inquiry. The alleged beneficial impact (increased graduation rates) redounds at the "back-end" while the adverse impact occurs up-front.

> [I]rrespective of the form taken by the discriminatory practice, an [institution's] treatment of other members of the plaintiffs' group can be "of little comfort to the victims of ... discrimination." Title [VI] does not permit the victim of a facially discriminatory policy to be told that he has not been wronged because other persons of his or her race or sex [benefited]. That answer is no more satisfactory when it is given to victims of a policy that is facially neutral but practically discriminatory.

*Connecticut v. Teal,* 457 U.S. 440, 455, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) (quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 342, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

Accordingly, the Court concludes that Plaintiffs have established a *prima facie* showing of a racially disproportionate ef-

---

**13.** According to the figures cited in the NCAA's July 27, 1998 memorandum, in 1996, African–Americans were selected at a rate only 78.4% of the rate at which whites were selected. In 1997, African–Americans were selected at a rate 82.0% of the rate at which whites were selected. *See also* Draft Table and Figures for Report 98–04, Feb. 9, 1998 (Exhibit 21 to Def.'s Reply). According to the figures cited by the Department of Education,

the percentage of African–American college-bound high school seniors who met Proposition 16's requirements constituted only 69.3% of the percentage of white college-bound high school seniors who met those same requirements. Additionally, African–American college-bound student-athletes cleared the test score hurdle at a rate only 74.0% of the rate at which white college-bound student-athletes cleared the hurdle.

fect sufficient to shift the burden of rebuttal to the NCAA.

### 2.

### Whether Proposition 16 Is Justified by an Educational Necessity

Under the educational necessity prong of the analysis, "the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate [educational] goals of the [institution]." *Wards Cove,* 490 U.S. at 659, 109 S.Ct. 2115. That is, the practice in question must bear a demonstrable "manifest relationship" to a legitimate goal. *See Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) (quoting *Griggs,* 401 U.S. at 432, 91 S.Ct. 849). "The touchstone of this inquiry is a reasoned review of the [institution's] justification for [its] use of the challenged practice.... [T]here is no requirement that the challenged practice be 'essential' or 'indispensable' " to the institution. *Wards Cove,* 490 U.S. at 659, 109 S.Ct. 2115. Rather, the defendant's burden of production at this stage is met only when the institution is able to offer

> some proof that the device serves identified legitimate and substantive [educational] goals. That is, the defendant's burden [is] to identify the particular [educational] goal and to present evidence of how the [challenged practice] "serves in a significant way" the identified goal. Merely being abstractly rational, as opposed to arbitrary, would not suffice. The defendant, therefore, has some burden of presenting objective evidence ... factually showing a nexus between the selection device and a particular [educational] goal. Without evidence of such a relationship it cannot be said that the defendant has presented any evidence that the "challenged" practice serves, in

a significant way, the legitimate [educational] goals of the [institution].

*Newark Branch, NAACP v. Town of Harrison, New Jersey,* 940 F.2d 792, 804 (3d Cir.1991) (quoting Mack A. Player, *Is Griggs Dead? Reflecting (Fearfully) on Wards Cove Packing Co. v. Atonio,* 17 Fla. St. U.L.Rev. 1, 32 (1989)).

The NCAA has proffered the following two goals as underlying the promulgation of Proposition 16: (1) raising student-athlete graduation rates, and (2) closing the gap between black and white student-athlete graduation rates. The Court will address the legitimacy of these goals before continuing to discuss whether a manifest relationship exists between Proposition 16 and those goals.

### a.

### Are these legitimate goals of the NCAA?

■ It is well established that the NCAA has become an indelible institution of intercollegiate athletics. "Since its inception in 1905, the NCAA has played an important role in the regulation of amateur collegiate sports. It has adopted and promulgated playing rules, standards of amateurism, standards for academic eligibility, regulations concerning recruitment of athletes, and rules governing the size of athletic squads and coaching staffs." *NCAA v. Board of Regents of Univ. of Okla.,* 468 U.S. 85, 88, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).[14] Indeed, it is fair to say that the NCAA has played a "historic role in the preservation and encouragement of intercollegiate amateur athletics." *Id.* at 101, 104 S.Ct. 2948. While neither party disputes these general assertions, the specific goals proffered as objectives of Proposition 16 require closer examination.

Preliminarily, the Court notes that it cannot seriously be disputed that the NCAA, acting only as the members' "surrogate with respect to athletic rules,"

---

**14.** *Accord Smith v. NCAA,* 139 F.3d 180, 183 (3d Cir.1998) (stating that the NCAA "is responsible for promulgating rules governing all aspects of intercollegiate athletics, including recruiting, eligibility of student-athletes, and academic standards"), *judgment vacated on other grounds,* —— U.S. ——, 119 S.Ct. 924, 132 L.Ed.2d 33 (1999).

*Smith,* 139 F.3d at 188, have no legitimate interest in promulgating academic standards that affect the graduation rates of students in general. The proper scope of their authority must be circumscribed to requirements pertaining only to student-athletes.[15] While the Court is sure that both parties are cognizant of this fact, their submissions have not always been as careful in making that distinction when discussing whether Proposition 16 is justified by an educational necessity.

In conclusory fashion, the NCAA initially stated that "[t]here can be no dispute that raising student athlete graduation rates are legitimate goals." Def.'s Response at 40. Then, in response to Plaintiffs' arguments (discussed below), the NCAA claimed that it is its membership, and not the NCAA officers or staff, who chooses the NCAA's policy objective and adopts the NCAA's bylaws. In so doing, they generally disavowed statements made by NCAA executives as merely personal opinions, stating that those individuals, "like every other member of the staff or any NCAA committee, does not determine the eligibility bylaws. That responsibility lies with the members." Def.'s Reply at 6.[16] According to the NCAA, Proposition 16 (like its predecessor Proposition 48) "is designed to discourage the recruitment of athletically talented, but academically unprepared students." *Id.* at 9. Thus, "because graduation rates are the best available measure of the degree to which student athletes are academically prepared for college, it makes perfect sense for the NCAA to look at graduation rates as a way of evaluating a rule's relative success." *Id.* at 9–10.

The NCAA also disputes Plaintiffs' argument that it is inappropriate to promote eligibility standards that result in a some-what higher graduation rate for student-athletes than for non-athletes. Citing the affidavit of the Chair of the NCAA Division I Board of Directors, the NCAA claims that (1) it is reasonable to apply eligibility standards that promote the chances of obtaining a college degree because an athletic scholarship is a substantial investment of resources by the granting institution; (2) an athletic scholarship also eliminates the financial concerns that inevitably cause some students to drop out from college; and (3) the motivation to remain in intercollegiate athletic competition is itself a powerful incentive for student-athletes to remain in school—an incentive that may have no counterpart for non-athletes. *See* Spanier Aff. ¶ 15 (Exhibit B to Def.'s Response).

Finally, the NCAA claims to have set out affirmatively to improve graduation rates and to narrow the black-white graduation rate gap. Contending that Plaintiffs have confused the second and third prongs of the disparate impact proof model, the NCAA argues that "[i]f the goal is sound, a practice to achieve that goal is not unlawful merely because of the severity of its adverse disparate impact." Def.'s Reply at 18. According to the NCAA, "[t]he degree of disparate impact becomes relevant only when the court analyzes (under prong three) whether equally effective alternatives exist that decrease an adverse disparate impact." *Id.*

In response, Plaintiffs contend that it is not the mission of the NCAA to ensure that students graduate but rather, it is within the province of each educational institution to put into place admissions policies, academic curricula, faculty, and necessary classroom and individual attention that bear on graduation rates. According to Plaintiffs, the NCAA is merely the enti-

---

**15.** *See, e.g.,* NCAA Const., art. I, rule 1.2 (Exhibit A to Docket No. 11); Proceedings of the 77th Annual Convention of the NCAA, at 106, NCAA 27631, Jan. 10–12, 1983 (statement of James A. Castaneda) (Exhibit 6 to Def.'s Response) (quoting Article 2 of the NCAA constitution and referring to the NCAA's role in promoting satisfactory standards of scholarship for student-athletes).

**16.** "Def.'s Reply" consists of a legal memorandum with 10 exhibits (Docket No. 58).

ty to whom member institutions have delegated the task of administering their intercollegiate athletics programs, which is evidenced by its role with respect to Division III schools wherein there are no initial eligibility rules simply because the members voted not to adopt one.

Plaintiffs also contend that the NCAA has failed to show that closing the black-white student-athlete graduation rate is a substantial legitimate justification rising to the level of educational necessity. According to Plaintiffs, the NCAA has tacitly admitted that the graduation rate gap between blacks and whites is the result of many more things than simply the difference in test scores and high school GPAs.[17] Interestingly, Plaintiffs' statistical expert has hypothesized that if it were legitimate for the NCAA to adopt an initial eligibility rule designed to yield a black student-athlete graduation rate within one percent of the white student-athlete graduation rate, the NCAA could simply exclude over 90% of the African–American student-athletes to achieve that result. *See* Hedges Aff. ¶ 11 (Exhibit 24 to Pls.' Ans.).

Plaintiffs also note that, when Proposition 48 was adopted, African–American student-athletes were already graduating at a rate higher than African–American students generally, and student-athletes were graduating at a rate equal to the overall student graduation rate.[18] Indeed, Plaintiffs contend that the NCAA has merely linked the goal of raising student-athlete graduation rates to the "perceived" problem that student-athletes are less like-

ly to be academically successful than their non-athlete student counterparts. Plaintiffs point out that the data suggest that both black and white student-athletes prior to the implementation of Proposition 48 graduated in rates comparable to (indeed, higher than) students of those racial groups in general.[19]

With respect to the NCAA's first proffered objective of raising student-athlete graduation rates, this Court concludes that it is a legitimate educational goal. An educational institution's primary mission is to educate and graduate as many students as possible who meet the level of academic proficiency deemed sufficient by the institution. Thus, raising graduation rates is directly in line with that mission. Here, as the surrogate of the colleges and universities in Division I, the NCAA is properly setting academic standards for student-athletes in hopes of improving the rate at which they graduate.

What is more probative than this kind of facial inquiry, however, is an examination of what specifically motivated the membership to undertake the promulgation of Proposition 16, and its predecessor, Proposition 48. After reading transcripts of the multiple NCAA convention proceedings, examining the NCAA research results and summaries, and analyzing the various NCAA memoranda and other documents in the record, the Court concludes that there is overwhelming and abundant support for the proposition that the member-

17. *See* McArdle Dep. at 134–37 (Exhibit 35 to Pls.' Ans.) (agreeing that it would be a mistake to conclude that the difference in black-white graduation rates is wholly attributable to differences in GPA and test scores); *see also* Def.'s Response at 10 n. 7 (citing scholarly studies documenting the discrepancy found in the distribution of standardized test scores for black and white students.).

18. Between 1983–1985, African–American student-athletes graduated at rates of 35%, 35%, and 36% respectively, as compared to African–American students generally who graduated at rates of 30%, 30%, and 32% in

those same years. *See* NCAA Research Report 96–01, at NCAA 17212, 17215 (Exhibit 9 to Pls.' Ans.). During those same years, student-athletes graduated at rates of 51%, 52%, and 52% respectively, as compared to students in general who graduated at rates of 51%, 52%, and 53%. *See id.*

19. *See id.* (showing that between 1983–1985, white student-athletes graduated at rates of 58%, 59%, and 59% respectively, as compared to white students generally who graduated at rates of 54%, 55%, and 55% in those same years).

ship was concerned about raising student-athlete graduation rates.[20]

While the evidence of graduation rates prior to the adoption of Proposition 48 suggests that there may have been no empirical need to raise the graduation rates of student-athletes, the Court sees no reason to judge the wisdom of embarking on this goal when the "perceived" abuses of student-athletes were, in fact, real. There appears to have been a perception that student-athletes were less academically prepared than the rest of the student body because, in the early 1980s, "a few highly publicized cases of perceived academic abuses by colleges and student athletes came to light. In response to charges of exploitation that stemmed from those stories, the NCAA adopted what has become known as Proposition 48 ..." NCAA Membership Services Initial Eligibility Satellite Video Conference, Aug. 19, 1998, Tr. at 7 (statement of Todd A. Petr) (as amended) (Exhibit 7 to Pls.' Ans.).

Certainly, a public relations benefit would redound to the NCAA for having promulgated academic standards to combat these stories of abuse and exploitation. However, merely because a public relations benefit exists does not render the NCAA's adoption of Proposition 48 (or 16) invalid. *But cf. Groves v. Alabama State Bd. of Educ.*, 776 F.Supp. 1518, 1531 (M.D.Ala.1991) (declaring illegal the selection of a minimum cutoff score "essentially as a public relations ploy, so that the Board and education professionals could misrepresent to parents concerned about their children's schooling that it was faithfully ensuring all new teachers would be 'as smart' as half—or to be more exact, 39%—of their students"). Setting academic standards in the hopes of raising student-athlete graduation rates is a legitimate goal directed towards curbing the abuses that were not only perceived, but were indisputably real and documented.

The same conclusion cannot be reached for the NCAA's second proffered objective of closing the gap between black and white student-athlete graduation rates. Not only is there no support for an educational institution (let alone its surrogate) to engage in such a goal, but the proffered goal was unequivocally not the purpose behind the adoption of the initial eligibility rules. Absolutely nothing in the record—transcripts of convention proceedings, research results, or memoranda—even suggest that this was a goal that motivated the promul-

20. *See, e.g.*, NCAA Division I Academics/Eligibility/Compliance Cabinet Subcommittee on Initial–Eligibility Issues Meeting Agenda, Sept. 9, 1998, at NCAA 28080 (Exhibit 23 to Def.'s Reply) ("The subcommittee believes that the initial eligibility standards need to reflect the Division I membership's commitment to improving the graduation rates for student-athletes while limiting as best possible the number of individuals eliminated from the pool of qualifiers who go on to graduate."); 1995 NCAA Convention Proceedings, at 257, NCAA 27458 (statement of Edward B. Fort) (Exhibit 12 to Def.'s Response) ("It is worthy of note that the special committee reached a consensus view. Their deliberations revealed that a choice of initial-eligibility rules must be guided by clear definition of goals. The latter would unavoidably involve two contrasting effects. Number one, graduation rates and, secondly, minority opportunities."); NCAA Resolution No. 174, at NCAA 27505 (Exhibit 10 to Def.'s Response) (authorizing a review of the initial eligibility requirements because, in part, "fundamental concerns of the Associ-

ation in the development and adoption of 1992 Convention Proposal 16 were the need to enhance the academic integrity of intercollegiate athletics programs and to encourage the adequate academic preparation of student-athletes, without unfairly limiting educational opportunities for student-athletes ..."); Report of NCAA Special Committee on Academic Standards, Aug. 15, 1985, at CB 0004059 (Exhibit 29 to Pls.' Ans.) ("Over the past decade, there has been increasing concern over the number of student-athletes entering Division I institutions of the NCAA inadequately prepared to meet the academic requirements for satisfactory progress and graduation."); Proceedings of the 77th Annual Convention of the NCAA, Jan. 10–12, 1983, at 107, NCAA 27631, (statement of James H. Zumberge) (Exhibit 6 to Def.'s Response) ("To restore the original intent of the athletic grants-in-aid and to reemphasize the primary [ ]mission of colleges and universities, a number of Division I presidents and chancellors seek to redefine the qualification of student-athlete.").

gation of Proposition 16 or 48. Indeed, the Court finds it difficult to reconcile the NCAA's current articulation of such a goal with their own documents plainly evincing that only two goals motivated the adoption of Proposition 16 and 48: "(1) raising of graduation rates, and (2) allowing more individuals access to the finite number of athletics opportunities available." NCAA Division I Academics/Eligibility/Compliance Cabinet Subcommittee on Initial–Eligibility Issues Mem., July 27, 1998, at 4 (Exhibit 2 to Pls.' Ans.). The NCAA does not even make the (unpersuasive) argument that its concern over "access to the finite number of athletic opportunities" is somehow equivalent to decreasing the graduation gap—the educational opportunity on which the NCAA would prefer this Court to focus. In fact, the NCAA's counsel opened oral argument before this Court by stating that the legitimate goal of the organization was to improve the academic performance of student-athletes, the best measure of which was graduation rates. No mention was made that a second objective of closing the black-white graduation gap existed.

Furthermore, the only place in the entire record that this goal is even articulated in the form of admissible evidence is in the affidavit of the Chair of the NCAA Division I Board of Directors. *See* Spanier Aff. ¶ 11 (Exhibit B to Def.'s Response) ("There has also long been a gap between black and white graduation rates. That gap has been reduced for student athletes under Proposition 48, and is projected to be reduced further under Proposition 16. This reduction is another highly desirable outcome and should be encouraged. I would be reluctant to sacrifice the gains achieved under Proposition 48 and projected under Proposition 16, in favor of a different eligibility standard that would result in a wider racial gap in graduation rates."); *accord id.* ¶ 12. In light of the NCAA's prior declaration disavowing statements made by NCAA executives as personal opinions not binding on the organization, *see* Def.'s Reply at 6, the Court is not entirely sure what to make of these lone statements.

The Court agrees that closing the black-white graduation rate gap is, as the NCAA states, "a subject of longstanding concern in the educational and civil rights communities." Def.'s Response at 15. However, that desirable outcome of Proposition 16, actual or projected, is simply a collateral benefit of promulgating a rule that sets heightened academic standards. Actually proffering such a "back-end" balancing between graduation rates as an express objective underlying Proposition 16 is in direct violation of the Supreme Court's prohibition against using a "bottom-line" defense to disparate impact cases involving pass/fail selection practices. *See Connecticut v. Teal,* 457 U.S. 440, 452–56, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) (achieving an appropriate racial balance after utilizing employer's entire promotional process did not preclude plaintiffs from establishing a *prima facie* case of disparate impact resulting from an examination administered to determine initially the employees eligible for promotion; moreover, such a "bottom-line" justification is an impermissible defense to employer liability).

Moreover, this explicitly race-based goal stands in stark contrast to the characterization of Proposition 16 as a facially neutral selection rule. The NCAA's continued contention that this goal underlies the promulgation of Proposition 16 raises serious questions concerning whether Proposition 16 is functioning simply as a proxy for a racial quota. This is especially so in light of the NCAA's research finding that "these group differences can be accounted for by taking into account the other high-school academic variables. This means that the prediction equation does not function differently for different racial groups." Report of the Special NCAA Comm. to Review Initial–Eligibility Standards, July 29, 1994, at 4, NCAA 15642 (Exhibit 19 to Pls.' Ans.).

Accordingly, the Court concludes that raising student-athlete graduation rates is a legitimate goal of the NCAA, but closing the gap between black and white student-athlete graduation rates is not.

b.

*Is there a manifest relationship?*

■ The NCAA claims that its own research demonstrates that the use of standardized test scores not only serves these goals but has, in fact, been instrumental in achieving some success. Moreover, the NCAA argues that the use of standardized test cutoffs has been accepted as a legitimate means of achieving educational goals even when a cutoff disproportionately disqualifies one racial group.

The NCAA also attests that the classes of 1985 and 1986 were covered by the same Satisfactory Progress Rules[21] throughout their college years, and that there was no substantive change in those rules between 1985 and 1992. From this, the NCAA concludes that the observed increase in African–American student-athlete graduation rates for the class of 1986 cannot be attributed in any way to the Satisfactory Progress Rules but rather, to Proposition 48, which took effect in that year.

The NCAA further claims that its own research demonstrates that Proposition 16's test score requirement significantly serves the stated objectives of the rule. According to those research results, high school GPAs and standardized test scores are a "significant but moderate predictor of college performance," with GPAs especially being a predictor of first year grades and both criterion being predictors of later graduation. NCAA Membership Services Initial Eligibility Satellite Video Conference, Aug. 19, 1998, Tr. at 21–22 (statement of John J. McArdle). Additionally, the NCAA contends that courts have recognized that the SAT and the ACT have been validated as predictors of academic performance in college and thus, the NCAA's use of standardized tests and a minimum cutoff score for the purpose of predicting college academic performance is proper.

Plaintiffs, however, argue that, in light of numerous internal recommendations that the rule be modified to eliminate the cutoff score, the current cutoff is arbitrary and irrational. Because student-athletes who fail to meet the cutoff score are deemed ineligible, regardless of how impressive their high school transcripts, Plaintiffs contend that the use of a cutoff score is fraught with peril. Moreover, Plaintiffs claim that the NCAA has never come forward with a valid educational necessity for a rule with an arbitrary cutoff requirement that is intended to yield a graduation rate for student-athletes that is higher than students generally. As an alternative, Plaintiffs would have this Court require a rule that is intended to predict graduation rates equal to that of the general student population. Such a rule (which is apparently based upon the NCAA's own data), has been prepared by Dr. Lawrence Hedges. *See* Hedges Aff. ¶¶ 2–9 (Exhibit 24 to Pls.' Ans).

In any event, under the manifest relationship analysis, the NCAA must produce "significant evidence that establishes a strong factual showing of manifest relationship between the" use of the particular cutoff scores of 820 and 68, and its goal of raising student-athlete graduation rates. *Newark Branch, NAACP v. Town of Harrison, New Jersey,* 940 F.2d 792, 804 (3d Cir.1991). That is, the NCAA "has some burden of presenting objective evidence . . . factually showing a nexus between the" use of the particular cutoff scores in question and the goal. *Id.* (internal quotations omitted). To the Court's knowledge, no court in this Circuit has yet ruled on the propriety of using standardized test cutoff scores as a facially neutral selection practice. Thus, some general propositions drawn from caselaw nationwide regarding

**21.** *See* Exhibit 15 to Pls.' Ans.; Exhibit 20 to Def.'s Reply.

cutoff scores will properly frame the ensuing analysis in this uncharted territory. Additionally, for ease of discussion, the Court will only refer to the SAT cutoff score of 820, although the analysis applies with equal force to the ACT cutoff score of 68.[22]

As a general matter, it is well accepted that the SAT has some predictive ability of academic success in college as measured by college grades. That is, the College Board has shown that there is a significant correlation between the combined SAT Math and Verbal scores and predicted college GPA.[23] In fact, the College Board's statistical research shows that there is a 0.51 mean correlation between the SAT total score and college course grades.[24] However, it bears noting that the SAT has only been validated as a predictor of first-year GPA, and not college graduation.[25] This is why it makes sense for college and universities to rely, at least in part, on the SAT in making admissions decisions.

The anti-discrimination statutes do not require the proponents of standardized tests "to introduce formal 'validation studies' showing that particular criteria predict actual ... performance." *Watson,* 487 U.S. at 998, 108 S.Ct. 2777. But by the same token, using a standardized test to achieve objectives for which it was neither intended nor validated would be improper. For example, then United States District Judge Walker (now sitting on the United States Court of Appeals for the Second

Circuit) concluded in *Sharif v. New York State Educ. Dep't,* 709 F.Supp. 345, 362 (S.D.N.Y.1989), that the defendants had "failed to show even a reasonable relationship between their practice" of using a SAT cutoff score and awarding merit scholarships for high school academic achievement because "[t]he SAT was not designed to measure achievement in high school and was never validated for that purpose."

As with all facially neutral practices challenged under the disparate impact theory, the use of a SAT cutoff score as a selection practice would be proper so long as it is justified. That is, an arbitrarily selected SAT cutoff score, in the sense that the particular cutoff in question was randomly chosen from the universe of possible choices (400 through 1600), would be invalid. *See, e.g., Groves v. Alabama State Bd. of Educ.,* 776 F.Supp. 1518, 1531 (M.D.Ala.1991) (concluding that the Board had arbitrarily selected a minimum cutoff score of 16 on the ACT).

Nonetheless, "[m]erely being abstractly rational, as opposed to arbitrary," will not suffice. *Harrison,* 940 F.2d at 804. Instead, a particular cutoff score affecting (in this case) student-athlete graduation rates "should normally be set so as to be reasonable and consistent with normal expectations of the acceptable proficiency" of student-athletes towards attaining a college degree. 1978 Uniform Guidelines on Employee Selection Procedures, 29 C.F.R.

---

**22.** Additionally, scores on one test can be converted to approximately equivalent scores on the other. *See, e.g., SAT I–ACT Score Comparisons* (visited Feb. 22, 1999) < http:// www.collegeboard.org/ sat/ html/ counselors/ stats/ stat004.html >.

**23.** *See, e.g.,* Brian O'Reilly, *Measuring the SAT: The SAT Is the Most Efficient Predictor of College Success* (visited Feb. 22, 1999) < http:// www.collegeboard.org/sat/html/ admissions/measurec.html >.

**24.** *See Recentered SAT I Scores as a Predictor of College Grades* (visited Feb. 22, 1999) <

http://www.collegeboard.org/sat/html/admissions/stats/stat003.html >.

**25.** *See* Gretchen Rigol, Symposium, *Insight Magazine,* May 18, 1998, at 24 (discussion by College Board vice president for Guidance, Access, and Assessment Services on whether colleges should eliminate the SAT as part of their admissions decisions); 1992 NCAA Convention Proceedings, Jan. 8, 1992, at 234, NCAA 001308 (statement of Edward B. Fort) (Exhibit 8 to Def.'s Reply) ("As we know, the purpose for which these tests were originally developed was not that concerned with student progress but instead predictability for academic success in college during at least the initial freshman year.").

§ 1607.5(H) (1999). Such a requirement makes intuitive sense to the Court, as it did for the Second Circuit:

> No matter how valid the exam, it is the cutoff score that ultimately determines whether a person passes or fails. A cutoff score unrelated to job performance may well lead to the rejection of applicants who were fully capable of performing the job. When a cutoff score unrelated to job performance produces disparate racial results, Title VII is violated.

*Guardians Ass'n of the New York City Police Dep't, Inc. v. Civil Serv. Comm'n,* 630 F.2d 79, 105 (2d Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981). In addition, "the existing [SAT] requirement would not be educationally justified if the particular cutoff score used by the [NCAA] to determine the eligibility of applicants is not itself a valid measure of the minimal ability necessary" to meet the goal of raising student-athlete graduation rates. *Groves,* 776 F.Supp. at 1530; *accord Grimes v. Sobol,* 832 F.Supp. 704, 710 (S.D.N.Y.1993) (quoting *Groves* ), *aff'd,* 37 F.3d 857 (2d Cir. 1994); *Association of Mexican–American Educators v. California,* 937 F.Supp. 1397, 1420 (N.D.Cal.1996) (quoting *Groves* ).

"Consequently, there should generally be some independent basis for choosing the cutoff." *Guardians,* 630 F.2d at 105. For example, the NCAA "might establish a valid cutoff score by using a professional estimate of the requisite ability levels, or, at the very least, by analyzing test results to locate a logical 'break-point' in the distribution of scores." *Id.*

Under the above-articulated standards, it is plainly apparent that the NCAA has offered no such basis in this case. It chose a cutoff that seemed acceptable from its consideration of, among other things, the "essential tension between two conflicting goals: (1) raising of graduation rates, and (2) allowing more individuals access to the finite number of athletics opportunities available." NCAA Division I Academics/Eligibility/Compliance Cabinet Subcommittee on Initial–Eligibility Issues Mem., July 27, 1998, at 4 (Exhibit 2 to Pls.' Ans.). Then it essentially engaged in a "wait and see" strategy to see if the predicted effects and outcomes would come to pass.[26]

Initially, the Court notes that the NCAA has not validated the use of the SAT, or any particular cutoff score of the SAT, as a predictor of student-athlete graduation rates. This is important because the average student body population at Division I schools between 1983 and 1989 was 529,-242, while the average student-athlete population at Division I schools during that same time period was 13,550—this amounts to a mere 2.56%. *See* NCAA Research Report 96–01, at NCAA 17212, 17215 (Exhibit 9 to Pls.' Ans.). Moreover, Division I schools do not represent all of the colleges and universities nationwide. These facts place into question the validity of the use of the SAT or any particular cutoff score in order to raise student-athlete graduation rates at Division I schools when the SAT was not validated for that purpose. While the NCAA's research found that "[t]he best college-level predictor of the student-athlete graduation rate was the graduation rate of the entire student body," the record did not reveal any studies or other support for the researcher's naked finding. Report of the Special NCAA Comm. to Review Initial–Eligibility Standards Mem., July 29, 1994, at 5, NCAA 15643 (Exhibit 19 to Pls. Ans.).

Aside from the validity of using the SAT as an accurate predictor of student-athlete

---

**26.** *See, e.g.,* McArdle Dep. at 42 (Exhibit D to Pls.' Opening) ("I meant that we didn't know what would happen, empirically, if Prop 48 had been put in place. We then tried to find out with our data what would have happened—what happened. But we were making guesses at this time about what would happen; what the effect would be."); 1995 NCAA Convention Proceedings, at 260–61, NCAA 27461–62 (statement of Francis X. Rienzo) (Exhibit 12 to Def.'s Response).

graduation rates, the record makes abundantly clear that, prior to adopting Proposition 16, the NCAA devoted substantial discussion towards the anticipated effects (raising graduation rates) and desired outcomes (increasing access to opportunities) of requiring additional high school coursework, using core GPA and SAT cutoff scores, and allowing for the index or sliding scale. Specifically, the 820 cutoff score being challenged in this action is roughly one standard deviation below the SAT national mean,[27] suggesting that the NCAA referred to an independent objective standard in identifying this particular cutoff score. What is special about a cutoff one standard deviation from the mean is that "[f]or any test, regardless of how carefully it was prepared, statistical analysis, based on the normal distribution curve, shows that there is 68% probability that successive scores would fall within a range of one standard deviation from an actual score." *Guardians*, 630 F.2d at 102. Thus, the Court cannot conclude that the 820 cutoff score was arbitrarily selected in the sense that the particular cutoff in question was randomly chosen from the possible values of 400 through 1600.

But these facts only demonstrate that the NCAA was being abstractly rational. "[U]nder *Wards Cove* the defendant's burden of production involves something beyond mere articulation of a rational basis for the challenged practice." *Harrison*, 940 F.2d at 802. It is apparent that, because the NCAA has relied exclusively on the predictive ability of the SAT on graduation rates of student-athletes in justifying the cutoff score, it has failed to analyze the issue in terms of what factors affect the graduation rate in addition to Proposition 16, thereby concomitantly failing to control for those variables. By simply pointing to the end result of graduation rates, the NCAA can all too obviously point to some relationship between choosing a particular cutoff score and increased graduation rates. However, it cannot possibly know with any degree of certainty whether the predicted increases in graduation rates are attributable to numerous factors other than the 820 cutoff score.[28]

Merely examining the outcomes of the initial eligibility rule does not demonstrate that the choice of the particular cutoff score in question serves the goal in a significant way. Taken to its logical end, the NCAA's proffered "manifest relationship" is tantamount to a rationalization of any cutoff score, once the SAT's predictive ability is presumed. Such a decisionmaking process, while reasoned to some degree, fails to demonstrate that there is "some independent basis for choosing the cutoff." Rather, to be legally justified, the NCAA must produce evidence explaining why it chose the 820 cutoff score, as opposed to any other cutoff score, aside from the fact that its members discussed and considered the matter in depth. Or, as the NCAA's counsel stated at oral argument, the standard of arbitrariness as a matter of law means that the cutoff score chosen must be related manifestly to the goal.

27. *See* NCAA Division I Academics/Eligibility/Compliance Cabinet Subcommittee on Initial–Eligibility Issues Mem., July 27, 1998, at 7 (Exhibit 2 to Pls.' Ans.); *see also* SAT I Verbal and Math: 1998–99 Mean Scores and Percentiles (visited Feb. 22, 1999) <http://www.collegeboard.org/sat/html/admissions/stats/stat001.html> (citing SAT national mean of 1017 and a standard deviation of 207 for 1998 college-bound seniors).

28. *See, e.g.,* J.J. McArdle, *A Summary of Research Results Related to Several NCAA Initial Eligibility Rules,* Oct. 24, 1994, at 14, M–0000571 (Exhibit 31 to Pls.' Ans.) (stating that "it is not appropriate to attribute [the observed increase in graduation rates relative to pre-Proportion 48 levels] to Prop 48" in light of multiple unknown factors); McArdle Dep. at 92 (Exhibit 17 to Pls.' Ans.) (stating that he had no idea what role, if any, the Satisfactory Progress Rules played in increasing graduation rates for student athletes); McArdle Dep. at 134–37 (Exhibit 35 to Pls.' Ans.) (agreeing that it would be a mistake to conclude that the difference in black-white graduation rates is wholly attributable to differences in GPA and test scores).

A review of the entire record indicates that it is notable more for what it does not present than for what it does. The Court appreciates the NCAA's intent that "[t]he eligibility standards limit freshman participation in intercollegiate competition to those students who have demonstrated a minimum level of readiness for college academic work." Spanier Aff. ¶ 7 (Exhibit B to Def.'s Response). However, the NCAA has failed to justify either (1) that its choice of a 820 cutoff score is reasonable and consistent with normal expectations of the acceptable proficiency of student-athletes towards attaining a college degree; (2) that its choice of a 820 cutoff score is the logical "break-point" in the distribution of SAT scores relevant to meeting its goal of raising student-athlete graduation rates (and increasing access to opportunities); or (3) that its choice of a 820 cutoff score is a valid measure of the minimal ability necessary to raise the graduation rates of student-athletes above those achieved prior to Proposition 16, let alone prior to Proposition 48.[29] Indeed, the NCAA has not even articulated what it would consider normal expectations of the acceptable proficiency of student-athletes towards attaining a college degree or what it would consider the minimal ability necessary to graduate. It relies, instead, on vague, unsupported notions such as the presumption "that students earning a [820] SAT have serious reading problems." 1995 NCAA Convention Proceedings, at 258, NCAA 27459 (statement of Freeman Hrabowski) (Exhibit 12 to Def.'s Response).

Significantly, the NCAA has failed to articulate in any meaningful manner the decisionmaking process behind the selection of the 820 cutoff score. A solitary statement by one member institution purports to provide a justification: "Available evidence supports the contention that a core grade-point average value of 2.500 would have approximately the same screening effects as the [820] SAT score or the [68] ACT score. Accordingly, it is this relationship between the core grade-point average of 2.500 and the SAT score of [820] or the ACT score of [68] that defines the basis of the index values established in Proposal 16." See 1992 NCAA Convention Proceedings, Jan. 8, 1992, at 233, NCAA 001307 (statement of Lorna P. Straus) (Exhibit 8 to Def.'s Response). And yet, the NCAA's own research consultant, Professor McArdle, belies such a rationale: "The actual determination of a cutoff score on any variable was *not possible from the research* evaluation. . . . While I did not pick any particular cutoff score or anchor points for this index, I did show various decision making committees how [a] cutoff score could be determined on a rational and objective basis." Letter to Mark Asher, May 31, 1995 (Exhibit 33 to Pls.' Ans.) (emphasis in original); *accord* Letter to Joseph Crowley, Jan. 10, 1995, at 3, M–0003003 (Exhibit 34 to Pls.' Ans.) ("The specific cutting point of SAT=[820] is not based on APS data . . . This number was initially an arbitrary test-score cutoff point.").

It is plain that multiple concerns in addition to the "two conflicting goals" underlie the adoption of an initial eligibility rule. For example, the record demonstrates that minimizing false negatives (those student-athletes deemed ineligible but who then graduate anyway) and false positives (those student-athletes deemed eligible but who then do not graduate) is one such concern.[30] Public relations issues may also

---

**29.** *But cf. Athletics and Academics in the Freshman Year: A Study of the Academic Effects of Freshman Participation in Varsity Athletics*, Dec. 1984, at 3–1 to 3–51, NCAA 12849–12899 (Exhibit 25 to Pls.' Ans.) (presenting statistical research to support an independent basis for choosing a GPA cutoff score of 2.0 for student-athletes).

**30.** *See, e.g.*, Report of the Special NCAA Comm. to Review Initial–Eligibility Standards Mem., July 29, 1994 at 6, NCAA 15644 (Exhibit 19 to Pls.' Ans.) ("The distributions of graduates and nongraduates overlap on the academic variables. Thus, the choice between desired outcomes, such as the false negatives vs. true positives, need to be defined in terms of utility weights.").

have been prevalent.[31] While it may be true that individual members "may have independently concluded that [ ] few student-athletes whose tests score below [820 or 68] have a reasonable prospect of earning a college degree in Division I institutions," *id.*, nothing in the record supports the conclusion that the cutoff score was adopted by the entire membership after due consideration of this issue.

In addition, contrary to the NCAA's blanket assertion that "[t]he degree of disparate impact becomes relevant only when the court analyzes (under prong three) whether equally effective alternatives exist that decrease an adverse disparate impact," Def.'s Reply at 18, the degree of impact is highly relevant in providing the Court with a basis for determining that the chosen cutoff score represents a reasoned decision by the NCAA, in light of the overwhelming evidence in the record attesting to the fact that the NCAA and its members were concerned over the impact any initial eligibility rule would have on African–Americans.

Indeed, the NCAA's own research report points to one example of how the NCAA could have come to their decision by using a mathematical model that picks a cutoff score after accounting for the members' concerns over the benefits and costs of an initial eligibility rule. *See generally* NCAA Research Report 91–05, Oct. 1992 (Exhibit 26 to Pls.' Ans.). The model has been explained as follows:

> A cutoff score on any variable can be determined objectively by relative weights on the costs and benefits of different outcomes. An "expected utility" analysis can be used to find the optimal cutoff score. In theory, this

approach allows decision makers to weigh the benefits of accurate predictions (the True Positives and True Negatives) against the costs of inaccurate predictions (the False Negatives and False Positives).

J.J. McArdle, *A Summary of Research Results Related to Several NCAA Initial Eligibility Rules,* Oct. 24, 1994, at 3, M–0000560 (Exhibit 31 to Pls.' Ans.).

By highlighting this method of decision-making, the Court is not limiting the NCAA to justifying its cutoff score solely by reference to an expected utility analysis. Indeed, "[i]n practice, this formal approach has been hard to use, mainly because different decision makers have very different goals and values, and some goals have proven to be [ ] contradictory." *Id.* The NCAA is free to use any reasonable means to arrive at a decision as to why the particular cutoff score chosen makes logical sense in reference to the goal of raising student-athlete graduation rates. This is why Plaintiffs' approach in criticizing the relative accuracy of Proposition 16 in predicting student-athlete graduation rates, as compared to other alternative formulations of an initial eligibility rule, *see, e.g.,* Pls.' Supp. Br. at 5–7, has no force under the facts of this case. Title VI does not require the NCAA to adopt the most accurate rule in terms of predictive power; it only demands that the NCAA justify how its choice of a rule serves a legitimate educational goal in a significant way.

The lack of justification behind the choice of the 820 cutoff is circumstantially revealed, for example, by the student-athletes in the partial qualifier region, whom the NCAA admits "look very similar in performance to several groups of student-

31. *See, e.g.,* 1992 NCAA Convention Proceedings, Jan. 8, 1992, at 235, NCAA 001308 (statement of Gregory M. St. L. O'Brien) (Exhibit 8 to Def.'s Response) ("In endorsing the indexing concept as expressed in Proposal No. 16, the committee expressed the view that the floor of [820] on the SAT or [68] on the ACT should continue to exist for the additional eligibility requirements for student-athletes in Division I institutions. The basis for this view likely differed across the membership of the Commission and the Council. Some may have been concerned about Congressional public relations and public reactions to perceived reductions in academic standards in this age of reform of intercollegiate athletics.").

athletes who are full qualifiers with lower GPAs. . . . The data indicate that partial qualifiers are performing at a slightly higher level than low-GPA full qualifiers. Taken as a whole, it is difficult to distinguish the academic performance of the partial qualifier from the performance of some qualifiers." NCAA Division I Academics/Eligibility/Compliance Cabinet Subcommittee on Initial–Eligibility Issues Mem., July 27, 1998, at 4 (Exhibit 2 to Pls.' Ans.).[32] The fact is that the difference in graduation rates of partial qualifiers and certain full qualifiers is not statistically significant. *See* Petr Dep. at 45 (Exhibit 11 to Pls.' Ans.).

Because the NCAA has failed to analyze the issue in terms of what constitutes an acceptable level of proficiency for a student-athlete to attain a college degree, or what constitutes the minimal ability necessary to graduate, the current choice of the 820 cutoff score results in this anomaly. "If the goal of the standard is to delineate those who would be successful in college from those who would not, then it would seem that it is not serving its intended purpose and in fact, may preclude students who would be academically successful from attending Division I schools." *See* Initial–Eligibility Survey Compilation, at 13 (Exhibit 22 to Def.'s Reply).[33] Indeed, this fact is readily inferred from the NCAA's own "selection line," which identifies individuals who "would have an equal probability of graduating as anyone else whose combination of test score and grades puts them on the line." NCAA Research Staff Mem., May 18, 1998, at 4, NCAA 27893 (Exhibit D to Pls.' Ans.); *accord* NCAA Membership Services Initial Eligibility

Satellite Video Conference, Aug. 19, 1998, Tr. at 37 (statement of John J. McArdle) (Exhibit 7 to Pls.' Ans.).

Accordingly, the Court concludes that the NCAA has not produced any evidence demonstrating that the cutoff score used in Proposition 16 serves, in a significant way, the goal of raising student-athlete graduation rates. Even if the NCAA had offered evidence sufficient to shift the inquiry back to Plaintiffs to show that they have carried their burden of persuasion, the Court concludes, as already shown above, that Plaintiffs have more than amply carried this burden by demonstrating that the racially adverse impact caused by the SAT cutoff score is not justified by any legitimate educational necessity.

In reaching this result, the Court stresses that this case does not preclude the use of the SAT, or any particular cutoff score of the SAT, in the NCAA's adoption of an initial eligibility rule. It may be "that no strong statistical basis exist[s] for the use of any particular single minimum test score," but that is for the NCAA to determine more definitively after undertaking an appropriate analysis justifying an independent basis for choosing a cutoff score. 1992 NCAA Convention Proceedings, Jan. 8, 1992, at 235, NCAA 001308 (statement of Gregory M. St. L. O'Brien); *accord id.* at 238, NCAA 001310 (statement of Francis X. Rienzo) (quoting the Academic Requirements Committee's May 1991 letter, which stated "The research does not support limitation of a cut-off score within the index.").

**32.** *Accord* NCAA Research Staff Mem., May 18, 1998, at 3, NCAA 27892 (Exhibit D to Pls.' Ans.); *see also* Letter to Joseph Crowley, Jan. 10, 1995, at 3, M–0003003 (Exhibit 34 to Pls.' Ans.) ("The explicit distinction and labelling of 'full' and 'partial' qualifiers at this cutoff, and the associated penalty (loss of the fourth year), was not generally consistent with the comparative academic performances of the APS students.").

**33.** *Accord* 1995 NCAA Convention Proceedings, at 263, NCAA 27464 (statement of William B. DeLauder) (Exhibit 12 to Def.'s Response) (stating that "the 1992 approval of Proposal 16 is not fully supported by the NCAA's own research. The 'double cut,' that is a minimum-core GPA and a minimum SAT, is totally arbitrary. In fact, it eliminates many students who are predicted to have the same chance of graduating as those admitted under Proposal 16.").

### 3.

*Whether There are Equally Effective Alternative Practices to Proposition 16*

 Notwithstanding the Court's conclusion above, Plaintiffs would ultimately prevail as they have carried their burden of persuasion to proffer an equally effective alternative practice that results in less racial disproportionality while still serving the goal of raising student-athlete graduation rates. Under Title VI, "equally effective" means equivalent, comparable, or commensurate, rather than identical. *See, e.g., Alexander v. Choate,* 469 U.S. 287, 294, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). The Third Circuit has even held that Plaintiffs may prevail "where they are able to suggest a *viable* alternative to the challenged practice which has the effect of reducing disparate impact and the employer refuses to adopt the alternative." *Newark Branch, NAACP v. Town of Harrison, New Jersey,* 940 F.2d 792, 798 (3d Cir. 1991) (emphasis added).

Plaintiffs principally proffer the alternative models in the NCAA's own memorandum as equally effective to Proposition 16. The memorandum presented four models that the NCAA is considering, the first of which is the retention of the current rule. After describing the nature of the three alternatives, a table will be presented summarizing their predicted effects. *See generally* NCAA Division I Academics/Eligibility/Compliance Cabinet Subcommittee on Initial–Eligibility Issues Mem., July 27, 1998 (Exhibit 2 to Pls.' Ans.).

The first alternative, Model 2, would essentially allow partial qualifiers to become full qualifiers. This would be achieved by lowering the minimum standardized test score needed for eligibility to a 720 on the SAT or a 59 on the ACT, and extending the range over which student-athletes are judged on their combined grades and test score on the sliding scale. The sliding scale of combined minimum test score and core GPA would apply to student-athletes with SAT scores between 720 and 1010 (ACT scores between 59 and 86) or core GPAs between 2.000 and 2.750. This would, however, still require a standardized test score that is higher in relation to national norms than the same comparison with respect to high school GPA.

In Model 3, current Proposition 16 partial qualifiers would become full qualifiers as would student-athletes with SAT scores between 600 and 720, provided they obtained the core GPA dictated by the sliding scale. This would be achieved by lowering the minimum standardized test score needed for eligibility to a 600 on the SAT or a 51 on the ACT, and extending the range over which student-athletes are judged on their test-grades combination score. The sliding scale of minimum test score and core GPA would apply to student-athletes with SAT scores between 600 and 1010 (ACT scores between about 51 and 86) or core GPAs between 2.000 and 3.050. The minimum SAT score of 600 is about two standard deviations below the national mean. As a result, high school grades and test scores would be evaluated equally in initial eligibility decisions.

Finally, in Model 4, initial eligibility would be based on a fully extended version of the current sliding scale. This would be achieved by eliminating the minimum core GPA and standardized test score needed for eligibility, and basing eligibility for all student-athletes on a test-grades combination score. As a result, a student-athlete's eligibility would depend entirely on an equally weighted combination of high school grades and standardized test scores.

The various alternatives and their predicted effects are summarized in the following table:

| Alternative | Overall Student–Athlete Graduation Rate | Black Ineligibility Rate | Black False Negatives |
|---|---|---|---|
| Proposition 16 | 61.8% | 19.4% | 15.7% |
| Model 2 (includes partial qualifiers as qualifiers) | 60.7% | 15.9% | 13.6% |
| Model 3 (extends sliding scale to 600 SAT/51 ACT) | 60.0% | 15.7% | 13.2% |
| Model 4 (full sliding scale) | 59.8% | 15.6% | 13.1% |

Even a cursory examination of these statistics demonstrates that the more selective rule (Proposition 16) projects a higher graduation rate for student-athletes. Conversely, the less selective rules (Models 2, 3, or 4) project fewer disqualifications of African–American students with lower test scores, at the cost of somewhat lower graduation rates.

However, even under Model 4, the projected student-athlete graduation rate of 59.8% is higher than all the rates previously experienced. For example, the graduation rate of student-athletes in the year prior to the adoption of Proposition 48 (1985) was 52%. *See* NCAA Research Report 96–01, at NCAA 17215 (Exhibit 9 to Pls.' Ans.). In the last year for which full data is available on Proposition 48 (1989), student-athletes graduated at a rate of 58%. And finally, for the freshman class entering in the year 1991–1992 (the latest year for which data is presented in the record), student-athletes graduated at a rate of 56%. *See* 1998 NCAA Division I Graduation–Rates Report, at 626 (Exhibit 17 to Def.'s Reply). All of these rates are undeniably surpassed by the 59.8% predicted under Model 4. Moreover, the NCAA estimates that "[t]his projected rate would still be about two percentage points higher than the current student-athlete graduation rate." NCAA Division I Academics/Eligibility/Compliance Cabinet Subcommittee on Initial–Eligibility Issues Mem., July 27, 1998, at 13 (Exhibit 2 to Pls.' Ans.).

Although Model 4 may be the least preferred from the NCAA's perspective, that consideration has no bearing on this prong of the analysis. Moreover, while the NCAA's counsel took the position at oral argument that the alternative graduation rate must be statistically significant to the rate predicted under Proposition 16, the NCAA has not demonstrated that there is something special about that particular graduation rate. Indeed, it can only be presumed that the goal of raising student-athlete graduation rates embodies the NCAA's desire to raise them beyond the level existing prior to the adoption of Proposition 16 and nothing more. Plaintiffs have shown at least three alternative practices resulting in less racial disproportionality while still serving the NCAA's goal of raising student-athlete graduation rates—not raising them above a certain threshold number. That is all the proof that Plaintiffs need to demonstrate under Title VI.

### III. CONCLUSION

Viewing each of the respective summary judgment motions in the light most favorable to the non-moving party, Plaintiffs' motion is GRANTED and Defendant's motion is DENIED. Plaintiffs are entitled to judgment in their favor on the merits of their Title VI claim.

An appropriate order follows.

## ORDER

AND NOW, this 8th day of March 1999, upon consideration of Plaintiffs' Cross–Motion for Summary Judgment (Docket No. 41), Defendant's response thereto and Motion for Summary Judgment (Docket Nos. 47 and 48), Plaintiffs' amended answer (Docket Nos. 53, 54, 56, and 57), Defendant's reply memorandum (Docket No. 58), the parties' supplemental submissions at the request of the Court (Docket Nos. 61, 62, 63, and 65), the parties' presentations at oral argument on February 12, 1999, the parties' post-argument letter briefs, and the parties' submissions with respect to their prior motions to dismiss/summary judgment (Docket Nos. 4, 5, 11, 13, 15, and 16), it is hereby ORDERED that Plaintiffs' motion is GRANTED and Defendant's motion is DENIED, in accordance with the accompanying opinion.

IT IS THE JUDGMENT and ORDER of the Court:

(1) That judgment is entered in FAVOR of Plaintiffs Tai Kwan Cureton, Leatrice Shaw, Andrea Gardner, and Alexander Wesby and AGAINST Defendant the National Collegiate Athletic Association;

(2) That the policy of denying eligibility to participate in intercollegiate athletics and/or receiving athletically related financial aid during the freshman year of all student-athletes who have failed to attain the minimum score on either of two standardized tests, the SAT or the ACT, known as "Proposition 16" and adopted as NCAA Bylaw 14.3, is hereby DECLARED illegal under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. and the regulations promulgated thereunder;

(3) That Defendant the National Collegiate Athletic Association, their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order, are hereby PERMANENTLY ENJOINED from continued operation and implementation of Proposition 16.

IT IS FURTHER ORDERED that, while the parties may seek an immediate appeal of this order, the Court retains jurisdiction over the case and expects a motion for class certification within twenty (20) days of the date of this order as previously stipulated. Both parties shall include briefing on what relief would be appropriate irrespective of whether a class is certified.

## MEMORANDUM

### I. INTRODUCTION

On March 8, 1999, this Court granted summary judgment to Plaintiffs on their claim that the initial eligibility rule of Defendant the National Collegiate Athletic Association ("NCAA"), which, inter alia, requires students to attain a minimum score on either of two standardized tests (the SAT or the ACT) as a condition of eligibility to participate in intercollegiate athletics and/or receive athletically related financial aid during their freshman year, has an unjustified disparate impact against African–Americans in violation of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d et seq., and certain implementing regulations promulgated thereunder. Accordingly, the Court declared illegal the minimum standardized test score requirement of the initial eligibility rule (included in NCAA Division I Bylaw 14.3) and permanently enjoined the NCAA from continued operation and implementation of the entire rule.

The NCAA now requests that this Court modify the order so as to be consonant with the wrong the Court was asked to address. Specifically, as neither the course requirements nor the core-GPA cutoff of Bylaw 14.3 were addressed by the Court, the NCAA argues that the order should only reflect the particular conclusions made by the Court concerning the use of the standardized test score cutoffs. The NCAA further contends that the injunction should only apply to the four named plaintiffs because a class has not

yet been certified. Additionally, the NCAA moves pursuant to Fed.R.Civ.P. 62(c) for an immediate stay of the injunction pending an appeal to the United States Court of Appeals for the Third Circuit.

## II. DISCUSSION

### A. *REQUEST FOR MODIFICATION*

■ To be clear, in the March 8, 1999 order, the Court expressed no opinion on the propriety of requiring additional high school coursework or using a core-GPA cutoff in formulating an initial eligibility rule. That is because Plaintiffs only challenged whether the use of the minimum standardized test score cutoffs were permissible under Title VI. As it currently reads, the order does not preclude the NCAA from utilizing grade-point averages and/or course requirements as a component in an initial eligibility rule, nor does it preclude it from adopting and implementing an interim rule. Properly interpreted, the order only enjoins the NCAA from denying eligibility based on the minimum standardized test score cutoffs found in Bylaw 14.3.

In considering the NCAA's proposed modifications, the Court initially notes that they would, in essence, not alter the Court's intended legal effect of either paragraphs (2) and (3). That is, the test score component would still be declared illegal and the NCAA, by being enjoined from denying eligibility based on the minimum test scores in Bylaw 14.3, would be in compliance with that declaratory judgment. However, because the lawsuit challenged a generally applicable, facially neutral selection practice in the context of a federal anti-discrimination law, it is one that by its very nature affects a group of similarly situated people, to wit, student-athletes. Thus, the proper scope of the injunction against the NCAA should continue to be permanent enjoinment from denying eligibility based on the standard-

ized test score component of Bylaw 14.3, even in the absence of class certification.

Should the NCAA interpret the import of the amended order as allowing them to determine eligibility based solely on the course and core-GPA requirements of the bylaw, that is a matter internal to the NCAA and its governance over the Division I membership. As the NCAA correctly posits, such a reading of the order should "be determined first by the NCAA in accordance with its own rules and practices on other aspects of initial eligibility, and not by this Court," Def.'s Letter (Mar. 10, 1999) at 3, and certainly not with either judicial approval or disapproval of such a practice.

Therefore, paragraphs (2) and (3) of this Court's March 8, 1999 order will be amended in accordance with this Court's discussion above.

### B. *STAY PENDING APPEAL*

It is well settled that the factors considered in issuing a stay under Fed.R.Civ.P. 62(c) are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *accord Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir.1991) (citing *Hilton*). After careful consideration of these factors, the Court concludes that a stay pending appeal is not warranted.

Throughout the course of this litigation, this Court has made several rulings that one or both parties are likely to challenge on appeal. Among those rulings, the Court has held that (1) the NCAA is subject to suit under Title VI pursuant to the "indirect recipient" and/or "controlling authority" theories of liability; (2) there exists an implied private right of action for

disparate impact discrimination under Title VI; and (3) Plaintiffs are entitled to judgment as a matter of law on the merits of their Title VI claim. *See generally Cureton v. NCAA,* 37 F.Supp.2d 687 (E.D.Pa.1999); *Cureton v. NCAA,* Civ. A. No. 97–131, 1997 WL 634376 (E.D.Pa. Oct. 8, 1997). While the Court believes that these rulings rest on solid footing, the Court also acknowledges that many of them involved new theories of liability and/or raised novel applications of well settled areas of law, at least in the Third Circuit. As such, the NCAA has made some showing that it may succeed on the merits of an appeal, although probably not a strong one.

However, the Court is unpersuaded that, absent a stay, the NCAA would suffer irreparable harm. The gravamen of the NCAA's argument is that it and its membership would experience administrative inconvenience while attempting to remain in compliance with the injunction. Moreover, the NCAA suggests that its own members, in the absence of a uniform initial eligibility rule, may renege on their prior commitments to sign-on high school seniors during the current recruitment season. After almost one hundred years of administering intercollegiate athletics, the establishment of any prospective initial eligibility rule and the policing of its own members are tasks the NCAA is more than well equipped to handle. Thus, the Court cannot conclude that any irreparable harm would result absent a stay.

By contrast, the named plaintiffs and other similarly situated student-athletes would incur substantial injury should a stay be issued. After a full adjudication on the merits, the Court has declared the minimum standardized test score component of Bylaw 14.3 racially discriminatory and illegal, thereby increasing access to educational opportunities in the very midst of the student-athlete recruiting season. To stay that injunction at this point would allow the NCAA to continue promulgating what this Court has already determined to be a discriminatory practice. And to that extent, a granting of a stay would not, in any way, further the public interest. This Court has an obligation not only to eliminate discriminatory effects of past practices, but also to prevent similar or continued discrimination in the future.

Accordingly, on balance, the Court concludes that a stay of the amended injunction pending appeal is not warranted.

### III. CONCLUSION

For the foregoing reasons, this Court's March 8, 1999 order will be amended to reflect with more precision what is being declared illegal and what is being enjoined. Additionally, the NCAA's emergency motion for a stay of the amended injunction pending an appeal to the Third Circuit will be DENIED.

An appropriate order follows.