

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-16-2001

# Cureton v. Natl Collegiate Athlet. Assoc.

Precedential or Non-Precedential:

Docket 00-1559

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

## Recommended Citation

"Cureton v. Natl Collegiate Athlet. Assoc." (2001). *2001 Decisions.* Paper 106.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/106

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 16, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1559

TAI KWAN CURETON; LEATRICE SHA W,
each individually and on behalf
of all others similarly situated;
ALEXANDER WESBY; ANDREA GARDNER

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIA TION

      Tai Kwan Cureton; Leatrice Shaw;
      Alexander Wesby; Andrea Gardner ,

      Appellants

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 97-cv-00131)
District Judge: Honorable Ronald L. Buckwalter

Argued November 9, 2000

Before: ROTH, MCKEE and STAPLETON, Cir cuit Judges

(Opinion filed May 16, 2001)

      Andre L. Dennis, Esquire (Argued)
      Danielle Banks, Esquire
      Stradley, Ronon, Steves & Young
      2600 One Commerce Square
      Philadelphia, PA 19103

Adele P. Kimmel, Esquire
Trial Lawyers for Public Justice, P.C.
1717 Massachusetts Avenue,
 N.W., Suite 800
Washington, D.C. 20036

J. Richard Cohen, Esquire
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104

 Attorneys for Appellants

David P. Bruton, Esquire (Argued)
Michael W. McTigue, Jr., Esquir e
Drinker, Biddle & Reath
18th & Cherry Streets
One Logan Square
Philadelphia, PA 19103-6996

Elsa Kircher Cole
General Counsel
National Collegiate Athletic
 Association
1802 Alonzo Watford Sr. Drive
Indianapolis, IN 46202

 Attorneys for Appellees

OPINION OF THE COURT

ROTH, Circuit Judge:

This is a putative class action by African-American student-athletes challenging the minimum standar dized test score requirement for fr eshman year varsity intercollegiate athletic participation. This suit began almost four years ago and has previously been befor e us on appeal. See Cureton v. National Collegiate Athletic Ass'n, 198 F.3d 107 (3d Cir. 1999). In the instant appeal, we must determine whether the District Court abused its discretion in denying plaintiffs' motion to alter or amend summary judgment and for contemporaneous leave to file a second amended complaint. We conclude that the District Court

2

did not abuse its discretion, and for the r easons that follow we will affirm the judgment of the District Court.

I. FACTS

The National Collegiate Athletic Association (NCAA) is an unincorporated voluntary association of more that one thousand members, a majority of which are public and private four-year colleges and universities that conduct varsity intercollegiate athletic programs. The NCAA member colleges are divided into Divisions. This suit deals with an NCAA bylaw called Proposition 16, which af fects initial eligibility only in Division I.1 Proposition 16, codified at NCAA Bylaw 14.3, has two components which operate on a sliding scale: a minimum high school grade point average (GPA) in thirteen required cor e courses and a minimum standardized test score on the Scholastic Aptitude Test (SAT) or the ACT Assessment.

Plaintiffs are African-American student-athletes who exceeded the NCAA minimum GPA requir ement for freshman year athletic participation but failed to achieve the minimum required score on the SA T as required by Proposition 16. They allege that, because of Pr oposition 16, they lost the opportunity to compete in Division I varsity intercollegiate athletics during their fr eshman year, were denied admission to Division I schools, were denied athletic scholarships, and/or were denied recruiting opportunities by Division I schools.

Because the factual and procedural history of this case bears directly on our decision, we recite it in some detail. Plaintiffs began this action on January 8, 1997, alleging that the minimum standardized test scor e component of Proposition 16 violated Title VI r egulations because it had an unjustified disparate impact on African-American student-athletes. As plaintiffs' counsel stated in a declaration filed with the District Court, counsel chose to pursue a disparate impact challenge to Proposition 16, rather than an intentional discrimination claim, because a

_____

1. Division I is comprised generally of the lar ger universities and colleges
with the greater availability of athletic scholarship monies.

3

disparate impact claim had a less "demanding" standard of proof. On February 5, 1997, the NCAA moved to dismiss plaintiffs' complaint, contending, inter alia, that (1) there was no private right of action for unintentional discrimination under Title VI; (2) the NCAA was not a "program or activity" subject to T itle VI; and (3) the NCAA did not receive the federal funding necessary to subject it to Title VI.

Plaintiffs responded to the NCAA's motion to dismiss and moved for partial summary judgment on the gr ounds that, as a matter of law, the NCAA was a covered pr ogram or activity subject to a Title VI action and was a recipient of federal financial assistance for purposes of T itle VI. The NCAA contends, and the District Court found, that as part of their opposition to the motion, plaintiffs demonstrated knowledge of several of the facts that plaintif fs would later allege were evidence of intentional discrimination. Specifically, plaintiffs referr ed to criticism from the administrator of the SAT and from the NCAA's own studies which warned that the NCAA's use of standar dized test scores for freshman eligibility would have a disparate impact on African-American student-athletes. Despite the existence of this evidence, however, plaintif fs did not suggest that it demonstrated intentional discrimination. To the contrary, the District Court found that plaintif fs praised the NCAA's motives in adopting initial eligibility standards as "laudable."

On October 9, 1997, the District Court denied the NCAA's motion to dismiss while granting in part and denying in part plaintiffs' motion for partial summary judgment. The court determined that there was a private right of action under Title VI for disparate impact[2] and held that the NCAA is a "program or activity" within the meaning of Title VI. However, the court left open the question of whether the NCAA receives federal funds as a result of its relationship with the National Youth Sports Program (NYSP).

_____

2. The Supreme Court has recently held that there is no private right of action to enforce disparate impact regulations promulgated under Title VI. Alexander v. Sandoval, ___ U.S. ___ (2001).

4

On June 22, 1998, the United States Supreme Court issued its decision in Gebser v. Lago Vista Ind. Sch. Distr., 524 U.S. 274 (1998). As a result, plaintif fs' counsel became aware that the Supreme Court had articulated a deliberate indifference standard, albeit in the Title IX context, to determine whether a recipient of federal funds could be liable for knowingly allowing discrimination to occur. Meanwhile, in response to the Supreme Court having granted certiorari in a Title VI case, the NCAA moved in September of 1998 to amend the District Court's October 9, 1997, order and to certify for appeal the question of whether Title VI's implementing regulations permitted a private right of action.

Plaintiffs acknowledge that they consider ed moving to amend their complaint to allege intentional discrimination at this point. However, because the District Court denied the NCAA's motion to certify the private right of action question for appeal, plaintiffs made a tactical decision not to move to amend their complaint. Plaintiffsfiled a motion for summary judgment on their disparate impact claim on October 6, 1998. That motion contained a footnote suggesting plaintiffs' belief that they could allege a purposeful discrimination claim in light of Gebser.3

On November 13, 1998, plaintiffs moved to amend their complaint by adding two additional named parties. The NCAA filed a cross motion for summary judgment on November 18, 1998, and opposed plaintiffs' motions for summary judgment and for leave to add party plaintif fs. In support of its motion for summary judgment, the NCAA attached the affidavit of an NCAA official who opined that one of the valid educational objectives of Pr oposition 16 was closing the gap between black and white student–athlete graduation rates.

By memorandum and order dated December 18, 1998, the District Court allowed the two additional named plaintiffs to intervene pursuant to Fed.R.Civ.P. 24. The District Court's order granting the motion specifically stated

_____

3. With the exception of that footnote, plaintiffs did not advance an intentional discrimination claim until after their disparate impact claim had been rejected on appeal.

that "it bears noting that the time is near to when motions of this sort would affect the close of discovery and consequently, any additional similar requests will be looked on with disfavor."

Subsequently, both parties filed supplemental submissions in support of summary judgment and participated in oral argument. On March 8, 1999, the District Court denied the NCAA's motion for summary judgment and granted plaintiffs' motion for summary judgment, declaring Proposition 16 unlawful under Title VI's implementing regulations and permanently enjoining application of Proposition 16. See Cur eton v. National Collegiate Athletic Ass'n, 37 F. Supp. 2d 687 (E.D.Pa. 1999). The District Court concluded that the NCAA was an indirect recipient of federal funding due to its complete control over the NYSP Fund. Alternatively, the District Court determined that the NCAA was subject to Title VI coverage because member schools had ceded contr olling authority to it.

Next, the District Court determined that the NCAA's legitimate objective in adopting Proposition 16 was raising overall student-athlete graduation rates and r ejected the NCAA's alternative justification of closing the gap between black and white student-athlete graduation rates. The court held that the NCAA's second proffer ed objective, closing the gap between black and white student-athletes, was "unequivocally not the purpose behind" adoption of Proposition 16. Finally, the court deter mined that the use of the standardized test score for fr eshman eligibility had an unjustified disparate impact on African-American student-athletes and that there were equally effective alternatives to the standardized test score component which could further the NCAA's objective of incr easing graduation rates of student-athletes. On Mar ch 16, 1999, the District Court clarified its injunction and enjoined the NCAA from denying eligibility based on the minimum standardized test component of Proposition 16.

On December 22, 1999, we reversed the District Court's grant of summary judgment to plaintiffs and r emanded the case with directions to enter judgment for the NCAA. See Cureton v. NCAA, 198 F.3d 107 (3d Cir. 1999). Specifically,

6

we found that the Title VI regulations under which plaintiffs sued were program specific (i.e., specific to the NYSP) and therefore did not reach Pr oposition 16. In addition, we rejected the "controlling authority" argument and found that the NCAA was not a recipient of federal funds based on its relationship to its member institutions.

On February 28, 2000, after the case was remanded to the District Court, plaintiffs filed a motion to alter or amend summary judgment and a motion for leave to amend their complaint under Federal Rules of Civil Pr ocedure 59(e) and 15(a). In their proposed amended complaint, plaintiffs allege that Proposition 16 has been adopted and used by the NCAA as an instrument of intentional discrimination against African-American student-athletes. On April 13, 2000, the District Court denied the motion, finding it to be untimely, prejudicial to the NCAA, and futile. The District Court denied plaintiffs' request for r econsideration, and plaintiffs timely appealed.

II. JURISDICTION AND STANDARD OF REVIEW

The District Court exercised federal question jurisdiction pursuant to 28 U.S.C. S 1331. We have jurisdiction over the District Court's final order denying plaintif fs' motion pursuant to 28 U.S.C. S 1291.

We review a district court's refusal to allow a plaintiff to amend his complaint pursuant to Fed.R.Civ.P. 15(a) for abuse of discretion. Adams v. Gould Inc. , 739 F.2d 858, 863 (3d Cir. 1984) cert. denied, 469 U.S. 1122 (1985). Similarly, when a district court rejects a motion to alter or amend a judgment filed pursuant to Rule 59(e), we r eview for abuse of discretion, except over matters of law, which are subject to plenary review. Id. at 863-64.

III. DISCUSSION

Both a motion to amend a judgment and a motion for leave to amend a complaint are addressed to the sound discretion of the district court. Where a timely motion to amend judgment is filed under Rule 59(e), the Rule 15 and 59 inquiries turn on the same factors. Id. ; Newark Branch,

7

NAACP v. Town of Harrison, 907 F.2d 1408, 1417 n.14 (3d Cir. 1990). A district court may deny leave to amend a complaint if a plaintiff 's delay in seeking amendment is undue, motivated by bad faith, or prejudicial to the opposing party. Foman v. Davis, 371 U.S. 178, 182 (1962). Moreover, the court may deny a r equest if the movant fails to provide a draft amended complaint, see Lake v. Arnold, 232 F.3d 360, 374 (3d Cir. 2000), or may refuse to allow an amendment that fails to state a cause of action. Adams, 739 F.2d at 864, citing Massarsky v. General Motors Corp., 706 F.2d 111, 125 (3d Cir. 1983).

The mere passage of time does not requir e that a motion to amend a complaint be denied on grounds of delay. Adams, 739 F.2d at 868. In fact, delay alone is an insufficient ground to deny leave to amend. Cornell & Co., Inc. v. Occupational Safety & Health Review Comm'n. , 573 F.2d 820, 823 (3d Cir. 1978). However , "at some point, the delay will become `undue,' placing an unwarranted burden on the court, or will become `prejudicial,' placing an unfair burden on the opposing party." Adams, 739 F.2d at 868. Delay may become undue when a movant has had pr evious opportunities to amend a complaint. See Lor enz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993) (three year lapse between filing of complaint and proposed amendment was "unreasonable" delay where plaintif f had "numerous opportunities" to amend); see also Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 654–55 (3d Cir. 1998) (rejecting proposed second amended complaint where plaintiffs were repleading facts that could have been pled earlier). When a party delays making a motion to amend until after summary judgment has been granted to the adverse party, other courts have recognized that the interests in judicial economy and finality of litigation may become particularly compelling. See Diersen v. Chicago Car Exch., 110 F.3d 481, 489 (7th Cir . 1997); Humphreys v. Roche Biomed. Lab. Inc., 990 F.2d 1078, 1082 (8th Cir 1993); Union Planters Nat'l Leasing Inc. v. W oods, 687 F.2d 117, 121 (5th Cir. 1982); Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 598 n.2 (5th Cir. 1981). Thus, while bearing in mind the liberal pleading philosophy of the federal rules, Adams, 739 F.2d at 864, the question of undue delay

8

requires that we focus on the movant's r easons for not amending sooner. Id. at 868.

Moreover, substantial or undue pr ejudice to the non-moving party is a sufficient ground for denial of leave to amend. Lorenz, 1 F.3d at 1414. The issue of prejudice requires that we focus on the hardship to the defendants if the amendment were permitted. Adams , 739 F.2d at 868. Specifically, we have considered whether allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts or new theories. Compare id. at 869 (finding no pr ejudice because no new facts or additional discovery were requir ed) with Rolo, 155 F.3d at 655 (finding duration of case and substantial effort and expense in resolving underlying motion to dismiss could constitute undue delay or prejudice to defendants) and Cornell, 573 F.2d at 823-24 (finding significant prejudice because proposed amendment changed legal and factual basis of claim and prevented defendant from presenting defense).

Turning to the case before us, the District Court, when it denied plaintiffs' post-judgment motion to amend, cited four reasons why plaintiffs' delay was undue: (1) the motion was filed three years after the complaint wasfiled; (2) the factual information on which the proposed amendment relied was known almost two-and-a-half years before plaintiffs sought leave to amend;4 (3) judicial efficiency would be damaged by trying claims seriatim; and (4) the interest in the finality of the proceedings would be compromised by amendment. Furthermor e, the District Court examined plaintiffs' asserted reasons for the delay in seeking amendment and determined that no "r easonable explanation" existed to overlook the delay. The court concluded that the only real reason advanced by plaintiffs for the substantial lapse in time was plaintif fs' misplaced confidence in their original disparate impact theory.

The court next concluded that the NCAA would be prejudiced if plaintiffs were allowed to amend the complaint

_____

4. In fact, the District Court found that the plaintiffs demonstrated knowledge of many of the facts supporting their intentional discrimination claim as early as July 1997.

9

to add a claim of intentional discrimination. It determined that the new claim might require the court to revisit the certification of the class and that amendment would lead to further discovery requests and significant new preparation. The court concluded that "the proposed amendment would essentially force the NCAA to begin litigating this case again."5

We cannot say that the District Court abused its considerable discretion in denying the post-judgment motion to amend. The court carefully analyzed plaintiffs' proffered reasons for delay, the prejudice to the NCAA, and the substance of the amended complaint. It concluded that the assertion of the claim was untimely and pr ejudicial to the NCAA. The District Court, which had considerable familiarity with the development of the factual and legal issues in this matter, concluded that the new claim fundamentally altered the proceeding and could have been asserted earlier. We find no err or in the District Court's conclusions.

Plaintiffs contend, however, that our decision in Adams warrants reversal of the District Court. W e disagree. In fact, a careful reading of Adams supports the District Court's decision to deny leave to amend.

In Adams, the plaintiffs brought an ERISA breach of fiduciary duty claim against the trustees of a pension plan. The defendants moved for summary judgment. In defending against this motion, plaintiffs advanced two legal theories. The District Court accepted plaintiffs' first theory and denied defendants' motion for summary judgment. The District Court did not address the alter native theory raised by plaintiffs. The District Court then certified a question for appeal based on the first theory. 739 F.2d at 862. We reversed the District Court's denial of summary judgment and directed that judgment be entered in favor of defendants. Id. at 863. We specifically declined to address the alternative legal theory which plaintif fs again sought to

_____

5. The District Court also concluded that allowing plaintiffs to amend would be futile. Because the District Court's judgment can be affirmed on grounds of delay and prejudice, we expr ess no opinion on the validity of the intentional discrimination claim alleged in plaintiffs' proposed amended complaint.

10

present. Id. at 863, 866 n.8. After r emand, plaintiffs "formally advanced the [alternative] theory," by moving to alter or amend the judgment, pursuant to Rule 59(e), and for leave of the District Court to file a second amended complaint, pursuant to Rule 15(a). Id. at 863. The District Court denied plaintiffs' motions. On the second appeal, we held that the District Court abused its discr etion in denying the motions to amend.

Plaintiffs contend that the instant matter is indistinguishable from Adams. They focus on the District Court's denial of the NCAA's motion for summary judgment, our reversal with instructions to enter judgment for the NCAA, and the District Court's denial, on r emand, of plaintiffs' motion to amend. However , plaintiffs overlook significant factual and procedural dif ferences between Adams and the instant matter.

Unlike the instant case, the alternative theory that the Adams plaintiffs ultimately pursued had been raised at earlier points in the litigation. "This contention was asserted earlier in the litigation in plaintif fs' briefs, but was not addressed either by the district court or by this court . . . ." Id. at 861. In Adams,"[w]e specifically limited our holding to the certified question, and declined to reach the issue now before us, although the plaintif fs tried to raise it at oral argument." Id. at 863.

Thus, in contrast to the plaintiffs her e, the Adams plaintiffs proffered the alter native theory to both the district and appellate courts prior to moving to amend. Mor e importantly, unlike the instant case, the Adams plaintiffs had not cross-moved for summary judgment and thus had not themselves sought a merits determination on their claims. In contrast, although the plaintiffs here by their own admission had sufficient facts and legal authority to allege an intentional discrimination claim at least by September of 1998, rather than attempting to add that claim, they filed for judgment on the merits on their disparate impact claim. A month later, they moved to add party plaintiffs, and the district court gave them the opportunity to do so.6 The District Court heard oral

_____

6. While plaintiffs styled their motion a"Motion to Amend to Add Party-Plaintiffs and/or Alternative Motion to Intervene," the District Court determined that the additional parties would be recognized as intervenors pursuant to Rule 24.

11

argument on the cross-motions for summary judgment and, after considering voluminous exhibits and the undisputed facts, resolved the legal issues and reached the merits of the disparate impact claim. See Cureton , 37 F. Supp. 2d 687. We reversed the District Court's or der on appeal. In light of the fact that plaintiffs participated in comprehensive proceedings which resulted in summary judgment for the NCAA, "the concerns offinality in litigation become more compelling [because] the litigant has had the benefit of a day in court, in some fashion, on the merits of his claim." Dussouy, 660 F .2d at 598 n.2.

Moreover, the Adams defendants demonstrated no prejudice from the amendment. Here, the prejudice to the NCAA is significant. During the lengthy and compr ehensive proceedings below, the NCAA had defended against a disparate impact challenge to Proposition 16 and had no notice that the question of discriminatory intent was at issue. This is not a case where the question of discriminatory intent permeates the plaintif fs' original claim. See Coventry v. U.S. Steel Corp., 856 F.2d 514, 519 (3d Cir. 1988) (finding little prejudice where defendant had notice of amended claim because additional issue permeated original claim); see also Adams , 739 F.2d at 869 (finding no prejudice where plaintif fs proffered alternative theory before both district and appellate courts before moving to amend). On the contrary, to the extent that the NCAA's intent had been addressed in this case, it had been characterized by plaintiffs as "laudable" and by the District Court as "legitimate." Cureton, 37 F. Supp. 2d at 701-05. Thus, if amendment were permitted, the NCAA would be prejudiced by having to engage in burdensome new discovery and significant new trial preparation.

In Adams, we recognized that these matters are committed to the District Court's sound discr etion. 739 F.2d at 868. The refusal to grant leave without any justification for the denial can be an abuse of discretion. See Foman, 371 U.S. at 182; Lake, 232 F .3d at 373. However, "[i]t is certainly not inconceivable to us that instances could occur in which the failure to make a timely motion to amend a complaint would place an unwarranted burden upon a trial court, or be prejudicial to the party

12

opposing the motion." Coventry, 856 F .2d at 520. In such circumstances, the obligation of the district court in its disposition of the motion is to articulate the pr ejudice caused by the delay and to balance those concer ns against the reasons for delay. Id. The District Court satisfied its obligation here. We find no reason to disturb its judgment.

IV. CONCLUSION

For the foregoing reasons, we conclude that the District Court did not abuse its discretion in denying plaintiffs' motion to alter or amend summary judgment and for contemporaneous leave to file a second amended complaint. We will affirm the judgment of the District Court.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

13